## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HEATHER HAUPTMAN, AND TIMOTHY MOSS, individually and on behalf of others similarly situated, <br><br>        Plaintiffs, <br><br> v. <br><br> INTERACTIVE BROKERS, LLC, <br><br>        Defendant. | Civil No. 17-cv-9382 <br><br> **<u>CLASS ACTION COMPLAINT</u>** <br><br> Jury Trial Demanded |

Plaintiffs Timothy Moss and Heather Hauptman ("Plaintiffs"), individually and on behalf of all others similarly situated, allege on personal knowledge, investigation of their counsel, and on information and belief, as follows:

### <u>NATURE OF ACTION</u>

1. Plaintiffs bring this action for breach of contract, promissory estoppel, negligence, breach of the covenant of good faith and fair dealing, unjust enrichment, and declaratory relief, seeking legal and equitable remedies, resulting from the unlawful actions of Interactive Brokers, LLC (hereinafter referred to as "IB" or "Defendant"), in connection with IB's improper administration of their Portfolio Margin Accounts and the Portfolio Margin Accounts of all other similarly situated investors.

2. "Portfolio margin" is a relatively new type of investment lending that employs a complex methodology for calculating margin requirements and generally allows for the use of higher leverage than standard "strategy-based" margin lending (commonly referred to as "Regulation T" margin lending). The U.S. Securities and Exchange Commission ("SEC") and the

regulatory predecessor to the Financial Industry Regulatory Authority ("FINRA")[1] amended FINRA Rule 4210 in 2007 to allow, for certain types of securities, portfolio margin trading in retail customer accounts. Specifically, and as explained in detail herein, Rule 4210(g) provides that broker-dealers may use portfolio margin to calculate margin requirements using a "risk-based" model, only in relation to specifically enumerated security types. This risk-based approach results in margin requirements that account for "offsetting" or "hedged" positions, and thus allows for potentially greater leverage to be utilized in an account. With the potential for substantially greater leverage and the use of complex mathematical calculations to determine the margin requirements, however, the potential risk to the investor in a Portfolio Margin Account can also be substantially greater.

3.      In light of the increased potential risks to the investor associated with portfolio margin trading, the SEC and FINRA promulgated clear and explicit rules regarding which securities may be properly considered under a "risk-based" model for purposes of determining margin requirements in Portfolio Margin Accounts. FINRA rules limit portfolio margin eligibility to specific investment product categories, such as equity-based securities, and derivatives on eligible equity securities — like options or warrants on equities.

4.      IB, however, disregarded this rule in administering its customers' Portfolio Margin Accounts. Instead, IB provides portfolio margin treatment for Exchange Traded Notes ("ETNs"), such as the Barclays Bank PLC iPath S&P 500 VIX Short-Term Futures ETN, traded under the symbol (and more commonly known as) the VXX. ETNs, and the VXX in particular, are not equities or (derivatives of equities), but instead are unsecured debt instruments. In the case of the

---

[1] FINRA is a self-regulatory organization ("SRO") for brokerage firms and securities markets, empowered pursuant to 15 U.S.C. § 78o-3(b). It is the successor in interest to, among other entities, the National Association of Securities Dealers, Inc. ("NASD"). In its capacity as a regulator, FINRA writes and enforces the rules governing the activities of the almost 4,000 broker-dealers in the United States, including Defendant IB. *See* http://www.finra.org/about (last visited 10/11/2017). Pursuant to 15 U.S.C. § 78s, FINRA's rules are reviewed and approved by the SEC.

VXX, for example, there is no equity position supporting the security. Instead, the value of the VXX is designed to track the movement of futures on an index that measures overall market volatility. As unsecured debt instruments that do not represent ownership of any underlying asset, ETNs – like the VXX – are not among the approved list of investment products eligible for portfolio margin.

5.    IB was informed directly and on several occasions, by both FINRA regulators and the Options Clearing Corporation (the "OCC"), that unsecured debt instruments such as the VXX are ineligible for portfolio margin and risk-based margining treatment. By continuing to provide portfolio margin's risk-based margining treatment for open positions in ETNs and options on ETNs – such as the VXX – IB knowingly violated FINRA rules to its customers' detriment, and knowingly breached its contractual agreements with its customers which obligated IB to follow FINRA rules and other industry regulations.

6.    Additionally, the disclosure form required by FINRA and provided by IB to its customers specifically lists each category of investment product that may be included for purposes of calculating portfolio margin requirements. ETNs are absent from that disclosure form.

7.    The FINRA rule restricting portfolio margining to only certain types of products is important. As FINRA informed IB, regulators promulgated Rule 4210(g) to exclude ETNs, such as the VXX, because the inherent risks associated with ETNs make them inappropriate for risk-based margin treatment. By including these inappropriate financial products in risk-based margin calculations, IB exposed its customers to the same excessive investment risk that FINRA rules, which the SEC formally approved, were designed to avoid.

8.    Furthermore, through its disclosures and other communications, IB informed its clients that ETNs would not be afforded portfolio margin treatment. Yet, IB violated FINRA rules,

ignored its own disclosures and exposed its customers to the very risks regulators sought to avoid when they approved the FINRA rules that IB agreed to follow.  Unfortunately, these risks materialized.  For example, Plaintiffs and other similarly-situated persons experienced a "blow out" (margin trading losses due to forced liquidation of positions) when the Dow Jones Industrial Average suddenly dropped by over 1,000 points on August 24, 2015, causing a spike in the VXX, as is more specifically recounted herein.

9.      By way of this class action lawsuit, Plaintiffs seek to vindicate the rights of themselves and all similarly-situated persons who had Portfolio Margin Accounts with IB at any time from December 1, 2011, through the date of judgment herein, in which portfolio margin treatment was applied to positions in or options on ETNs ("the putative Class").

**JURISDICTION AND VENUE**

10.      This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA") codified as 28 U.S.C. § 1332(d)(2).  The matter in controversy exceeds $5,000,000, in the aggregate, exclusive of interest and costs.

11.      This Court has jurisdiction over IB because IB does substantial business in this District.  Furthermore, IB consented to this Court's jurisdiction pursuant to the Interactive Brokers LLC Customer Agreement ("Customer Agreement") (attached hereto as Exhibit 1) between itself and Plaintiffs.  Under the Customer Agreement (in ¶ 32), all disputes between IB and its customers are "governed by the laws of the State of New York" and the "Courts of New York have exclusive jurisdiction over disputes relating to this Agreement, except when arbitration is provided."

12.      Venue is proper in the United States District Court for the Southern District of New York under 28 U.S.C. §§ 1391(b) and (c) because a substantial part of the events or omissions giving rise to the claims asserted occurred in this District, and Defendant is deemed to reside in

any judicial district in which it is subject to personal jurisdiction at the time the action is commenced. Also, as alleged above, the Customer Agreement provides that the Courts of New York are the exclusive venue for any disputes arising under that Agreement.

**PARTIES**

13.  Plaintiff Timothy Moss is, and was at all times mentioned herein, an individual citizen of the State of Colorado, and currently resides in that state.

14.  Plaintiff Heather Hauptman is, and was at all times mentioned herein, an individual citizen of the State of Colorado, and currently resides in Argentina.

15.  Defendant Interactive Brokers, LLC is a Connecticut corporation with its headquarters and principal place of business in Greenwich, Connecticut.

**FACTUAL ALLEGATIONS**

**Margin Trading and Portfolio Margin Accounts**

16.  Margin trading is a practice by which investors are able to leverage their existing portfolio of securities and cash in order to purchase or sell additional securities.  In non-margin trading, the maximum risk of loss to the investor in any particular position is the amount of money put into the account to purchase that position.  In margin trading, the investor risks the principal, in addition to any money loaned by the broker-dealer.

17.  In light of this risk, margin trading is subject to FINRA rules and requirements designed to protect investors and the public interest.[2]  In particular, all margin accounts have a "margin requirement," which represents the minimum equity value that must be in the account at

---

[2] The statutory basis for the promulgation of FINRA Rule 4210(g) explains that, "FINRA believes that the proposed rule change is consistent with the provisions of Section 15(A)(b)(6), which requires, among other things, that the FINRA rules must be designed to prevent fraudulent and manipulative acts and practices, *to promote just and equitable principles of trade, and in general to protect investors and the public interests.*" Securities and Exchange Commission, SR-2008-041 at 5 (emphasis added).

any time to serve as collateral.  For example, a margin requirement of 50% means that a hypothetical investor must maintain equity in the margin account equal to 50% of the total value of the assets in the portfolio.

18.     If the account falls below the margin requirement, the broker-dealer or other financial institution administering the account may issue a "margin call."  When a margin call is issued, the investor must put additional capital into the account to bring it up to the margin requirement, liquidate positions and turn the proceeds over to the broker-dealer to retire a portion of the margin debt, or some combination of the two.

19.     Margin requirements are designed to control and manage the risk of margin trading. The higher the ratio between account value and the amount of the portfolio financed by the financial institution, the lower the risk that an investor will be forced to "pay out of pocket" to make the financial institution whole in the event of a decline in the value of the financial instruments that comprise the account.  Correspondingly, the lower the margin requirement, the greater the risk that the investor will suffer a large loss in the event of a decline in value of the positions that make up the account.  As such, the margin requirement represents an assessment of the acceptable amount of risk allowed under regulations for positions in a margin account.

20.     Portfolio margining is a relatively new methodology for determining margin requirements and was authorized by the SEC and FINRA (f/k/a the NASD) in 2007 for use by retail investors.  Portfolio margin differs from traditional margin by virtue of the manner in which the margin requirement is calculated. Under traditional "strategy-based" or "Regulation T" margining, the margin requirement is typically determined by a formula that is a function of the size and market price of each position.  Portfolio Margin requirements differ from Regulation T margining in that they are calculated using a complex statistical model that assesses the potential

volatility of each security, and then measures the potential impact of various price movements on a portfolio as a whole.  The calculations that inform Portfolio Margin requirements are created according to a methodology known as the Theoretical Intermarket Margining System ("TIMS model"), and the data from the TIMS model is distributed to broker-dealers by the OCC after the close of trading on each trading day.  Broker-dealers then apply the data from the TIMS model to their customers' Portfolio Margin positions to determine each customer's Portfolio Margin requirement.  The margin requirement determined according to the TIMS model reflects the regulatory minimum for Portfolio Margin Accounts.

21.    One of the primary ways that the portfolio margin model differs from the traditional model is by considering the risk of "hedged" positions.  Hedged positions are two or more securities that normally react in an offsetting manner according to market movements, and are generally designed to reduce risk.

22.    Because Portfolio Margin requirements are calculated in a manner that assesses the relative risk profile of a particular portfolio (at least in theory), Portfolio Margin Accounts that are "hedged" allow for a level of leverage to the account holder that is potentially far greater than would be available under a standard strategy-based margin model.  For instance, on information and belief, IB allows the gross position value of a Portfolio Margin Account to reach as high as 50 times the net liquidating value, or equity, of the account.

**FINRA Regulations of Portfolio Margin Trading**

23.    Margin trading is governed by FINRA Rule 4210.  As discussed above, FINRA, with the approval of the SEC, amended Rule 4210 in 2007 to authorize Portfolio Margin trading.[3]    FINRA Rule 4210(g) specifically governs Portfolio Margin.  The SEC and FINRA

---

[3] Portfolio Margin began as a pilot program under the NASD on April 2, 2007, and the SEC allowed FINRA to make portfolio margin permanent in 2008.

designated which securities may be afforded portfolio margin or "risk-based" margin treatment. Rule 4210(g)(6)(B)(i) delineates precisely what types of financial products are eligible for Portfolio Margin treatment. Specifically:

> For eligible participants . . ., a transaction in, or transfer of, an eligible product may be effected in the portfolio margin account. Eligible products under this paragraph (g) consist of:
>
> > a. a margin *equity security* (including a foreign equity security and option on a foreign equity security, provided the foreign equity security is deemed to have a "ready market" under SEA Rule 15c3-1 or a "no-action" position issued thereunder, and a control or restricted security, provided the security has met the requirements in a manner consistent with Securities Act Rule 144 or an SEC "no-action" position issued thereunder, sufficient enough to permit the sale of the security, upon exercise or assignment of any listed option or unlisted derivative written or held against it, without restriction);
> >
> > b. a listed option on an *equity security* or index of *equity securities*;
> >
> > c. a security futures product;
> >
> > d. an unlisted derivative on an *equity security* or index of *equity securities*;
> >
> > e. a warrant on an *equity security* or index of *equity securities*;
> >
> > f. a related instrument as defined in paragraph (g)(2)(D) [i.e., as "broad-based index futures and options on broad-based index futures covering the same underlying instrument."][4]

24.    FINRA has issued further guidance on the types of financial products to be considered when calculating portfolio margin requirements, reinforcing that:

> All margin *equity securities* (as defined in Section 220.2 of Regulation T of the Board of Governors of the Federal Reserve System), warrants on margin *equity securities* or on eligible indices of *equity securities*, equity-based or equity-index based listed options, and security futures products (as defined in Section 3(a)(56) of the Securities Exchange Act of 1934) are eligible to be margined in a portfolio margin account. In addition, a customer that has an account with equity of at least five million dollars may establish and maintain positions in unlisted derivatives (e.g., OTC swaps, options) on a margin equity security or an eligible index of equity

---

[4] FINRA Rule 4210 (g)(6)(B)(i) (emphases added).

*Footnote continued on next page*

securities that can be priced by a theoretical pricing model approved by the Securities and Exchange Commission ("SEC").[5]

25.     In sum, FINRA Rule 4210(g)(6)(B) and associated guidance stands for the proposition that only *equity securities*, and options or derivative products derived from equity securities or equity-based indices, are eligible for treatment under the portfolio margin methodology.  The margin requirement for products ineligible for portfolio margin, such as ETNs, must be calculated according to the far more restrictive Regulation T requirements.

**Exchange Traded Notes**

26.     An ETN is not an equity security, but rather an *unsecured debt* instrument traded on the major stock exchanges.  ETNs function in some respects like a promissory note — the investor pays money to the financial institution issuing the ETN, and upon maturity, the investor receives a payment of money in return.  But unlike a traditional promissory note, which regularly pays a fixed amount upon maturity plus interest, the value of ETN upon maturity is pegged to a particular market index and subject to the creditworthiness of the issuer of the note.  Therefore, an ETN is an investment on the future state of the market, or a particular aspect of the market, at the time the ETN matures, as well as a stake on the ability of the issuing bank to avoid defaulting on the note prior to maturity.

27.     An example of an ETN is the Barclays Bank PLC iPath S&P 500 VIX Short-Term Futures ETN, traded under the stock symbol VXX.  The VXX is tied to a spread of short-term futures contracts related to the CBOE Volatility Index (ticker symbol VIX), a popular measure of the implied volatility of the S&P 500 index.   The CBOE Volatility Index represents one measure of the market's expectation of stock market volatility over the next 30-day period.

---

[5] FINRA Regulatory Notice 08-09 (herein after referred to as "FINRA NTM 08-09") (March 14, 2008) (emphases added).

28.     In short, the VXX note is derived from futures contracts on the VIX index, which in turn are derived from the VIX index, which in turn is derived from an indexed calculation of the volatility of the market as a whole, which in turn is derived from the action of individual equities in the market.  The structure of the VXX means that fluctuations in the broader securities market have a disproportionately large impact on the VXX.  Because the VXX, like all ETNs, is securitized and traded on an exchange, the price of VXX notes move on a continuous basis in response to changes in market conditions.

29.     The VXX and other ETNs are not eligible products for portfolio margin treatment, according to FINRA Rule 4210(g)(6)(B).  In contrast ETNs are **debt** instruments, in which the issuing financial institution owes a debt to the holder of the note.  The FINRA rule limits Portfolio Margin treatment to equity-based securities; debt instruments such as the VXX note and options on VXX notes are ineligible for Portfolio Margin treatment.

30.     FINRA has made it clear to brokers (including, specifically, IB) that ETNs are not eligible for consideration in calculating Portfolio Margin requirements.  In an email to David Battan, General Counsel and Executive Vice President of IB, Steve Yannolo from FINRA Credit Regulation stated: "[i]t was recently brought to our attention that the OCC is providing P/L for ETNs.  ***Since these are debt instruments, they are ineligible for portfolio margin.***"  This was reiterated in a follow-up email to Mr. Battan and other IB employees from Mr. Yannolo the following day that states "because of the[ir] inherent risk," ETN products (such as the VXX) "should not get a risk-based treatment, as they are debt products and not eligible for portfolio margin."  Instead, Yannolo explained FINRA "expect[ed] firms" such as IB "to apply higher strategy-based margin requirements" to such products.  Additionally, in a prior proceeding, IB's own expert witness, the FINRA Managing Director of Credit Regulation and co-author of FINRA

NTM 08-09, testified that ETNs do not fit the definition of "Eligible Investments" for Portfolio

Margin under SEC approved FINRA rules or IB's own Portfolio Margin Disclosure.[6]

## IB'S Administration of Portfolio Margin Accounts

31.    Interactive Brokers, LLC, is the largest subsidiary of the publicly traded company

Interactive Brokers Group, Inc.  IB is an electronic-only broker-dealer and trading platform and is

one of the largest such entities in the United States.  IB is regulated by FINRA and subject to

FINRA rules.

32.    When a customer opens an account with IB to engage in trades, he or she agrees to

the "Interactive Brokers LLC Customer Agreement," which provides in part: "**All transactions**

**are subject to rules and policies of relevant markets and clearinghouses, and applicable laws**

**and regulations.**"[7]  This provision contractually obligates IB to conduct trades on the basis of

"applicable laws and regulations," which includes relevant FINRA rules.

33.    In addition, under the section labeled "Margin," the Customer Agreement states

that "[m]argin transactions are subject to initial and maintenance margin requirements of

exchanges, clearinghouses ***and regulators*** and also to any additional margin requirement of IB,

which may be greater."[8]  Thus, once again, the Customer Agreement contractually obligates IB to

conduct margin transactions in accordance with the margin requirements of regulators such as

FINRA.

---

[6] In sworn testimony in FINRA Case No. 15-03035, Rudolph Verra, the FINRA Managing Director of Credit Regulation through December of 2013 previously testified to the following:
Q: And do you see there where it says positions eligible for a portfolio margin accounts"?
A. (Verra):  Yes, I do.
Q. I just want to make sure we are clear.
A. (Verra):  Uh-Huh.
Q. Do ETNs, Exchange Traded notes, fit any category there in paragraph 4 [of FINRA NTM 08-09]?
A. (Verra):  No.
[7] Ex. 1 at ¶ 6 (emphasis added).
[8] *Id.* at ¶ 11(B) (emphasis added).

*Footnote continued on next page*

34.     Finally, that same section of the Customer Agreement states that the "[c]ustomer represents that he or she has read the 'Disclosure of Risks of Margin Trading' provided separately by IB."[9]  The "Portfolio Margin Risk Disclosure Statement,"[10] describes the limitations governing which positions in an account may be subject to Portfolio Margin calculations.  Specifically, under "Positions Eligible for a Portfolio Margin Account," the disclosure states:

> All margin equity securities (as defined in Section 220.2 of Regulation T of the Board of Governors of the Federal Reserve System), warrants on margin equity securities or on eligible indices of equity securities, equity-based or equity-index based listed options, and security futures products (as defined in Section 3(a)(56) of the Securities Exchange Act of 1934) are eligible to be margined in a portfolio margin account. In addition, a customer that has an account with equity of at least five million dollars may establish and maintain positions in unlisted derivatives (e.g., OTC swaps, options) on a margin equity security or an eligible index of equity securities that can be priced by a theoretical pricing model approved by the Securities and Exchange Commission ("SEC").[11]

35.     The language in the disclosure is a word-for-word copy of the FINRA NTM 08-09, the regulatory guidance interpreting FINRA Rule 4210.  As such, IB's Portfolio Margin Risk Disclosure Statement warrants and represents that all transactions will be conducted in accordance with FINRA's Portfolio Margin requirement calculation guidelines, and explicitly lists the only securities eligible to receive portfolio margin treatment.  Unsecured debt securities, like ETNs, are not included.

36.     Additionally, in or around April 2014, IB published on its website a notice stating that ETNs were not eligible for Portfolio Margin treatment, and that IB would not provide Portfolio Margin for ETNs, including, but not limited to, the VXX.[12]  Such notice remained on IB's website until January 2016.

---

[9] *Id.* at ¶ 11(A).
[10] *See* Ex. 2.
[11] *Id.* at ¶ 4.
[12] *See* Ex. 3.

37.     It turns out, however, that during the Class Period, IB calculated the margin requirement for ETNs in its customers' Portfolio Margin Accounts in a manner that applies risk-based margin requirements, despite the fact that by IB's own admission ETNs are not eligible for Portfolio Margining.   As such, IB is acting in a manner directly contrary to its Customer Agreement, its own disclosures, and FINRA regulations that IB is contractually obligated to follow.

38.     As stated above, FINRA specifically informed IB in early 2014 that ETNs were not eligible for Portfolio Margin treatment.   As a result, IB was unquestionably aware in early 2014 that it was administering its accounts in a manner inconsistent with the Customer Agreement, its own disclosures, and FINRA regulations.   Nevertheless, IB continued to include ETNs in its calculations of Portfolio Margin requirements even after being informed that the practice violated FINRA Rule 4210.  On information and belief, IB continues to include ETNs in the calculation of Portfolio Margin requirements as of the date of this filing.

**Losses Suffered Because of IB'S Wrongful Conduct**

39.     Margin trading functions similarly to a line of credit extended by the broker-dealer to the customer.  Just as a reduction in the value of a mortgaged home reduces the equity in the home, but not the amount owed on the mortgage, a loss in the value of the financial products in a margin account reduces the value of the customer's collateral in the account.  This can result in a negative equity situation (i.e., the loan against the account is more than the value of the positions in the account).  Further, because of the use of leverage through margin, losses accumulate more rapidly.  In the case of investments that are made pursuant to Portfolio Margin, because of the substantially higher leverage provided, a small move in market prices can result in massive losses (or gains) in an account.

40.     Both the traditional strategy-based margin requirements, but especially the newer risk-based margin requirements, are based on complex formulas and models which can vary from security to security.  IB customers rely on IB's trading interface and the calculations IB's systems perform in order to determine the margin requirements and margin compliance of the customer's portfolio.  In fact, because of the complexity associated with margin calculations, especially portfolio margin calculations, IB's customers are wholly reliant on IB to report the margin requirements to them.  Likewise, IB prides itself on its sophisticated trading interface and publicly touts that its trading software offers traders a superior platform for monitoring risk and executing trades.

41.     Because IB customers are reliant upon IB to calculate the margin requirements for their portfolios, and because IB applies the incorrect margin calculations for ETNs in a Portfolio Margin Account, IB allows and executes margin trades that are not permitted by FINRA regulations and the Customer Agreement.  Furthermore, these improper trades greatly increase the risk to IB's clients.  In addition to the increase in risks, the additional leverage afforded by IB increases the commissions, interest and fees assessed to its portfolio margin customers.  Because IB knowingly violated industry rules in allowing trades, any losses from those trades are directly attributable to IB's violation.

**Facts Relating to Named Plaintiffs**

42.     Heather Hauptman is a long-time resident of Colorado who currently lives in Argentina.  Ms. Hauptman engaged the services of a financial advisory firm, Meridian Capital Advisors, LLC ("Meridian"), and provided them with discretionary authority over her investments.[13]

---

[13] A discretionary account allows a financial advisor to make trades in an investor's account without prior approval or authorization from the investor for any trading.

43.     On or about June 19, 2015, Ms. Hauptman, at the recommendation of her financial advisor, opened an account with IB and signed the Customer Agreement.  That same day, she signed the Portfolio Margin Risk Disclosure Statement.  *See* Exhibits 1 and 2.

44.     Ms. Hauptman's account included VXX positions. Unbeknownst to Ms. Hauptman, IB immediately began to improperly apply Portfolio Margin treatment to her VXX positions. Meridian maintained and traded positions in the VXX in Ms. Hauptman's Portfolio Margin Account for approximately three months.  For example, on August 21, 2015, Meridian sold 125 call options on the VXX and purchased 125 put options on the VXX in Ms. Hauptman's account.[14] By selling calls and buying puts on the VXX, Meridian was taking a "short" position in the VXX. If the price of the VXX dropped or stayed the same prior to expiration of the contracts, Ms. Hauptman would benefit in two ways: (1) the call options would expire worthless, allowing Ms. Hauptman to keep the premium collected from the sale of those options; and (2) the put options would benefit from an increase in value.  If the price of the VXX rose, however, then Ms. Hauptman would be required to deliver notes of the VXX to the buyer of the call options and would lose 100% of the funds used to purchase the put options.  Moreover, Ms. Hauptman would be required to purchase VXX notes on the open market and deliver them to the buyer of the call options.  In such a case, Ms. Hauptman's loss would be the difference between the market price at which she was forced to purchase the VXX notes, and the "strike" price of the option.  Meridian's VXX option trades on August 21, 2015 hinged on the expectation that the VXX price would fall.

45.     Ms. Hauptman's trades in the VXX options occurred in her Portfolio Margin Account, and IB applied the risk-based margin model (rather than the strategy-based margin model) to calculate the margin requirements for the ETN positions.

---

[14] Each option contract represents 100 notes of the VXX.  Thus, Meridian sold call options on 12,500 VXX notes and bought put options on 12,500 notes of the VXX.

46.    As of the end of day on August 21, 2015, the total value in Ms. Hauptman's Portfolio Margin Account was in excess of $200,000.

47.    Timothy Moss is a similarly affected investor.  Like Ms. Hauptman, Tim Moss also engaged Meridian and gave it discretionary authority over his investments.  His savings had been with Meridian since 2011.  Outside of his investments managed by Meridian, he had limited investment experience.  As Meridian managed both the Plaintiffs' accounts, the trading in each of the accounts was very similar.  Like Ms. Hauptman, Meridian was trading the VXX and options, as well as other securities, on the VXX in Mr. Moss's account.  As in Ms. Hauptman's account, IB applied Portfolio Margin requirements to Mr. Moss's VXX positions.

48.    At the beginning of August of 2015, Mr. Moss' account held numerous positions including VXX and options on the VXX.  As in Ms. Hauptman's account, Meridian shorted 128 VXX calls on August 21, 2015.  IB calculated the margin requirement for this trade using Portfolio Margin.  At the end of the day on August 21, 2015, the Mr. Moss' account was valued at approximately $186,000.

49.    Over the weekend after August 21, 2015, events unfolding in the Asian markets began to impact the American markets, and U.S. stock futures began to drop.  At around 12:00 AM on the morning of August 24, 2015, IB changed the margin requirements, increasing the margin requirement for the VXX and VXX option positions for all of its clients, including Plaintiffs.[15]  When the market opened on August 24, 2015, the Dow index dropped 1,000 points and the price of the VXX spiked.   As a result, the value of Plaintiffs' Portfolio Margin Accounts (and those of all similarly situated IB customers) dropped.  Further, because IB had so dramatically

---

[15] The exact increase of Plaintiffs' margin requirement is unknown, but on information and belief, similarly-situated customers had the margin requirement on VXX short call positions instantaneously increased by as much as 600%.

increased the Portfolio Margin requirements, many customers were put into a margin deficiency situation.

50.     In response to the massive increase in the margin requirement, coupled with the decrease in the account value, from August 25 to August 31, IB force liquidated most of the positions in Plaintiffs' accounts, resulting in large losses.  In the month of August, Ms. Hauptman's account lost over $175,000, primarily as a result of the VXX and VXX option trades that occurred using Portfolio Margin leverage.  Likewise, in the month of August, the Mosses lost around $150,000, with most of the losses due to VXX and VXX option trades that occurred using portfolio margin leverage.

51.     This scenario was not unique to Plaintiffs, and, in fact, occurred in many other IB accounts that week.  In a number of cases, the VXX trades and subsequent liquidations resulted in margin deficiencies.  In a twist of irony, IB invoked FINRA Rule 4210 and its portfolio margin disclosures and customer agreements—the very rule and agreements it breached when it applied portfolio margin requirements to the VXX—in order to collect on the margin deficiencies from some of its customers.

52.     Fortunately, in the instant case, IB's actions did not result in these Plaintiffs owing a margin debt to IB.  Unfortunately, like many IB customers, Plaintiffs saw their accounts lose most of their value in August 2015 as a direct result of IB's improper portfolio margining.

53.     In short, having only been customers of IB for less than four months, Plaintiffs suffered losses equal to approximately 85% of their accounts' values.

## **CLASS ACTION ALLEGATIONS**

54.     Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

55.     Plaintiffs bring this action individually and on behalf of all other persons similarly situated (hereinafter referred to as "the Class") pursuant to Federal Rule of Civil Procedure 23.

56.     Plaintiffs propose the following Class definition, subject to amendment as appropriate:

> All persons who held a Portfolio Margin Account with Interactive Brokers, LLC, containing a position or option in an ETN at any point from December 1, 2011 through the date of judgment, and whose ETN positions received Portfolio Margin treatment.

Collectively, all these persons will be referred to as "Class members."  Plaintiffs represent, and are members of, the Class.  Excluded from the Class are Defendant, and any entities in which Defendant has a controlling interest, and Defendant's agents and employees, and any Judge to whom this action is assigned and any member of such Judge's staff and immediate family.

57.     Plaintiffs do not know the exact number of members in the Class, but reasonably believe that Class members number, at a minimum, to be more than 1,000.

58.     Plaintiffs and members of the Class have been harmed and/or continue to be harmed by the acts of Defendant.

59.     Plaintiffs seek injunctive and declaratory relief on behalf of themselves and all Class members, as well as damages in their individual capacity.

60.     The joinder of all Class members is impracticable due to the number of Class members.

61.     Additionally, the disposition of the claims in a class action will provide substantial benefit to the parties and the Court by avoiding a multiplicity of identical suits, as well as

inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class.

62.     Further, the Class can be identified easily through records maintained by the Defendant.

63.     There are well-defined, nearly identical, common questions of law and fact affecting all parties.

64.     The questions of law and fact, referred to above, involving the class claims predominate over questions that may affect individual Class members.

65.     Such common questions of law and fact include, but are not limited to, the following:

    a.     Whether positions or options in ETNs qualify for portfolio margin treatment under FINRA rules;

    b.     Whether IB includes positions or options in ETNs in its portfolio margin calculations;

    c.     Whether IB was aware that it was including positions or options in ETNs in its portfolio margin calculations, in violation of Portfolio Margin rules;

    d.     Whether IB breached its Customer Agreement with its customers by including positions or options in ETNs in its portfolio margin calculations;

    e.     Whether Plaintiffs and the Class are entitled to a declaratory judgment that IB breached its Customer Agreement with its customers by including positions or options in ETNs in its portfolio margin calculations;

    f.     Whether IB promised its customers that it would calculate portfolio margin requirements in a manner consistent with FINRA rules;

g.      Whether IB's statement in its Portfolio Margin Risk Disclosure Statement with regard to how it would calculate portfolio margin requirements constituted a promise made to its customers;

h.      Whether IB broke its promises to customers by including positions or options in ETNs in its portfolio margin requirement calculations;

i.      Whether the duty that IB owed to its customers included that IB would exclude positions or options in ETNs from its portfolio margin calculations;

j.      Whether IB breached that duty by including positions or options in ETNs in its portfolio margin calculations;

k.      Whether IB breached the covenant of good faith and fair dealing by including positions or options in ETNs in its portfolio margin calculations;

l.      Whether IB should be enjoined from giving positions or options in ETNs portfolio margin treatment in the future.

66.     The claims of Plaintiffs are typical of the claims of the Class they seek to represent. Plaintiffs and other Class members held Portfolio Margin Accounts including positions or options in ETNs during the Class Period.

67.     Plaintiffs will fairly and adequately represent and protect the interests of the Class.

68.     Plaintiffs have no interests which are antagonistic to any member of the Class.

69.     Plaintiffs have retained counsel experienced in handling class action claims involving breaches of contract and violations of SEC and/or FINRA rules.  Plaintiffs' counsel are also experienced in prosecuting the claims of investors against their broker-dealers.

70.     Common issues predominate over any individual issues.  The focus of these claims is on IB's conduct, which did not vary as between class members.  Resolution of these common

questions will drive the claims of all Class members toward judgment or resolution: they involve a "fatal similarity" for purposes of the claims of all class members.

71.     A class action is the superior method for the fair and efficient adjudication of this controversy.

72.     Class-wide relief is essential to compel IB to comply with the relevant FINRA rules regarding Portfolio Margin Accounts, and abide by its contracts and agreements.

73.     Plaintiffs therefore seek certification of the Class pursuant to Rules 23(b)(1)(A), (b)(2), and (b)(3).  Plaintiffs seek certification of a Rule 23(b)(1)(A) class.  Adjudicating IB's liability for the facts and claims alleged here poses a substantial risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for IB if a class is not certified.

74.     Plaintiffs seek certification of an injunctive and declaratory relief class pursuant to Rule 23(b)(2).  IB has acted on grounds generally applicable to the Class, and the violations complained of herein are substantially likely to continue in the future if an injunction is not entered. Therefore, final injunctive relief and corresponding declaratory relief with respect to the Class as a whole is appropriate.

75.     Plaintiffs seek certification of a Rule 23(b)(3) class.  As detailed above, common questions regarding IB's conduct predominate over any individual issues, and a class action is superior to the alternative of hundreds or thousands of individual cases involving the same core facts and claims.

76.     In the alternative, Plaintiffs seek certification of an "issues" class pursuant to Rule 23(c)(4).  This class would incorporate, and allow for the adjudication of, all issues the Court

adjudges to be common to members of the class and subclass, such as one or more of the common issues identified by Plaintiffs in ¶ 65, *supra*.

## CAUSES OF ACTION

### FIRST COUNT

### Breach of Contract

**A.      Breach of the Customer Agreement to Abide by applicable Rules and Regulations**

77.      Plaintiffs incorporate by reference the preceding paragraphs of this Complaint as if fully stated herein.

78.      In order to use the IB trading platform, a potential customer must enter into the Customer Agreement with IB, which "governs the relationship between Customer and [IB]."  Ex. 1, at ¶ 1.  Therefore, Plaintiffs and each member of the Class entered into the Customer Agreement with IB.

79.      The Customer Agreement states that "[a]ll transactions are subject to . . . applicable laws and regulations."  *Id.* at ¶ 6.

80.      The "applicable laws and regulations" referenced in paragraph 6 of the Customer Agreement includes FINRA Rule 4210 regarding the proper calculation of margin requirements for Portfolio Margin Accounts.

81.      In addition, the Customer Agreement specifically states that "Margin transactions are subject to initial and maintenance margin requirements of . . . regulators. . . ."  *Id.* at ¶ 11(B). The "initial and maintenance margin requirements of . . . regulators" incorporates and includes FINRA Rule 4210 regarding the proper calculation of margin requirements for Portfolio Margin Accounts.

82.     IB did not calculate margin requirements for the accounts of Plaintiffs and Class members in a manner consistent with FINRA Rule 4210.  Specifically, IB's risk-based margin calculations included ETNs in contravention to that rule.  Such products are, by the explicit terms of FINRA Rule 4210, not eligible to be considered for purposes of portfolio margin calculations.

83.     By including ETNs in its calculation of portfolio margin levels for the accounts of Plaintiffs and Class members, and thus failing to abide by "applicable laws and regulations" and "margin requirements of . . . regulators," IB breached its Customer Agreement with Plaintiffs and members of the Class.

84.     As such, IB breached its Customer Agreement with Plaintiffs and Class members.

85.     IB's breach of the Customer Agreement resulted in losses to Plaintiffs and Class members, and continues to expose them to harm in the form of investment losses that would not have been realized if IB had fulfilled its obligations under the Customer Agreement.

86.     These losses reflect damages to Plaintiffs and Class members in an amount to be proven at trial or in a separate proceeding or proceedings if necessary.

**B.     Breach of the Portfolio Margin Disclosure**

87.     Plaintiffs incorporate by reference the preceding paragraphs of this Complaint as if fully stated herein.

88.     In order to open a portfolio margin account, a potential customer must acknowledge the FINRA mandated Portfolio Margin Disclosure modeled after FINRA NTM 08-09.  Ex. 1.  Such disclosure is incorporated by reference into the agreements governing the language between clients and IB.  Therefore, Plaintiffs and each member of the Class entered are a party to the Portfolio Margin Disclosure with IB.

89.     Paragraph 4 of the Portfolio Margin Disclosure details the only products eligible to receive portfolio margin treatment.  Ex. 2, ¶ 4. ETNs are not included in that definition.  Such

disclosure constitutes an agreement between Plaintiffs and each member of the Class that IB would not apply portfolio margin to products other than those listed in Paragraph 4 of the Portfolio Margin Disclosure.

90.    By including ETNs in its calculation of portfolio margin levels for the accounts of Plaintiffs and Class members, and thus failing to abide by the terms of the Portfolio Margin Disclosure, IB breached its agreement with Plaintiffs and each member of the Class.

91.    IB's breach of the terms of the Portfolio Margin Disclosure resulted in losses to Plaintiffs and Class members, and continues to expose them to harm in the form of investment losses that would not have been realized if IB had fulfilled its obligations under the Portfolio Margin Disclosure.

92.    These losses reflect damages to Plaintiffs and Class members in an amount to be proven at trial or in a separate proceeding or proceedings if necessary.

## SECOND COUNT

## Promissory Estoppel

93.    Plaintiffs incorporate by reference the preceding paragraphs of this Complaint as if fully stated herein, except for the paragraphs in the other Counts, *infra* and *supra*.

94.    IB represented and promised to its customers in its Customer Agreement that it would conduct its calculation of portfolio margin requirements in a manner consistent with "applicable laws and regulations," Ex. 1, at ¶ 6, and "subject to initial and maintenance margin requirements of … regulators. . . ."  Id. at ¶ 11(B).

95.    In addition, IB's Portfolio Margin Disclosure Statement, which all customers must review and sign pursuant to the terms of the Customer Agreement (see id. at ¶ 11(A)), warrants that "[a]ll margin equity securities (as defined in Section 220.2 of Regulation T of the Board of

Governors of the Federal Reserve System), warrants on margin equity securities or on eligible indices of equity securities, equity-based or equity-index based listed options, and security futures products (as defined in Section 3(a)(56) of the Securities Exchange Act of 1934) are eligible to be margined in a portfolio margin account." Ex. 2, at ¶ 4.

96.     Also, IB made public representations through website postings that it would not apply portfolio margin to ETNs. Ex. 3.

97.     Plaintiffs and Class members justifiably relied on IB's representations that it would calculate portfolio margin requirements in a manner consistent with applicable rules, such as FINRA Rule 4210, and its own Portfolio Margin Disclosure Statement.

98.     IB failed to abide by "applicable laws and regulations" and the "margin requirements of . . . regulators," in the form of including ETNs in its portfolio margin calculations for Plaintiffs and Class Members.

99.     ETNs are not an equity security, nor a warrant or index of such securities, nor an option or a security future product.  Instead, ETNs are debt instruments.

100.    IB violated its own disclosures with regard to its customers with Portfolio Margin Accounts by including ETNs in IB's portfolio margin calculations.

101.    IB therefore violated its promise, set forth in the Customer Agreement, to abide by FINRA Rules with regard to the administration of Portfolio Management Accounts.

102.    IB therefore acted in contradiction to its public and private pronouncements that it would not apply portfolio margin to ETNs.

103.    As a direct and proximate result of IB's breach of its explicit promises, Plaintiffs and Class members suffered losses, in the form of investment losses that would not have occurred

if IB had fulfilled its promises.  These losses reflect damages to Plaintiffs and Class members at an amount to be proven at trial.

## THIRD COUNT

### Unjust Enrichment

104.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein, except for the paragraphs in the other Counts, *infra* and *supra*.

105.    By improperly calculating portfolio margin requirements to include ETN positions, IB overstated the amount of funds available to Plaintiffs and Class members to make margin-financed trades.  As a result of IB's improper calculation methodology, margin-financed trades were made by Plaintiffs and Class members that would not have occurred but for the improper calculations.

106.    IB received fees and/or commissions from every trade made by Plaintiffs and Class members on Portfolio Margin Accounts, including those trades that would not have been made but for the improper portfolio margin requirement calculations.

107.    Additionally, IB charged interest on the margin loans that would not have been allowed but for the improper portfolio margin requirement calculations.

108.    Also, IB received fees for lending securities for transactions that would not have been allowed but for the improper portfolio margin requirement calculations.

109.    IB has therefore been unjustly enriched by these trades and margin loans that would not and should not have happened if IB had utilized appropriate and FINRA mandated portfolio margin requirement rules.

110.    Plaintiffs and Class members conferred a benefit on IB of which IB had knowledge, as IB was aware that ETNs were not appropriate financial products for consideration in portfolio margin requirement calculation, as stated in FINRA rules.

111.    The circumstances are such that it would be inequitable, unconscionable, and unjust to permit IB to retain the benefit of moneys that it unfairly obtained from Plaintiffs and other members of the Class.

112.    Plaintiffs and Class members, having been harmed by IB's conduct, are entitled to recover funds as a result of the unjust enrichment of IB to their detriment.

## FOURTH COUNT

### Breach of the Implied Covenant of Good Faith and Fair Dealing

113.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein, except for the paragraphs in the other Counts, *infra* and *supra*.

114.    The implied covenant of good faith and fair dealing, which inheres in every contract, obligates IB to honor its representations that it would calculate portfolio margin requirements in a manner consistent with FINRA Rule 4210 and IB's own Portfolio Margin Risk Disclosure Statement.

115.    IB breached this covenant by including ETNs in the calculation of the portfolio margin requirements for Plaintiffs and Class members.

116.    As a direct and proximate result of IB's breach, Plaintiffs and Class members suffered losses that would not have occurred if IB had fulfilled its promises.

117.    These losses reflect damages to Plaintiffs and Class members in an amount to be proven at trial or in a separate proceeding or proceedings.

## FIFTH COUNT

### Negligence

118.    Plaintiffs incorporates by reference all other paragraphs of this Complaint as if fully stated herein, except for the paragraphs in the other Counts, *infra* and *supra*.

119.    IB had a duty to exercise reasonable care in conducting and facilitating transactions for its customers.

120.    IB's standard of care for its customers is codified in the form of regulations promulgated by FINRA, which has supervisory authority over broker-dealers and other entities in the financial industry.

121.    IB unlawfully breached this duty by knowingly incorporating ETNs into the calculation of portfolio margin requirements for its customers, in violation of FINRA Rule 4210.

122.    Defendant's negligent and wrongful breaches of its duties owed to Plaintiffs and Class members proximately caused losses, in the form of investment losses that would not have occurred if IB had shown due care toward its customers by following the FINRA rules for Portfolio Margin accounts

123.    These losses reflect damages to Plaintiffs and Class members in an amount to be proven at trial or in a separate proceeding or proceedings.

### SIXTH COUNT

### Declaratory and Injunctive Relief

124.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein, except for the paragraphs in the other Counts, *infra* and *supra*.

125.    There exists an actual controversy under the terms of the Customer Agreement, and applicable law governing the same, as to whether IB may consider ETNs in the calculation of portfolio margin requirements for Portfolio Margin Accounts.

126.    This question is common to Plaintiffs and Class members who seek a declaration of their rights and legal obligations in addition to such other relief which might be granted by this Court.

127.    Pursuant to 28 U.S.C. § 2201, this Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

128.    Plaintiffs and Class members are interested parties who seek a declaration of their rights and legal obligations vis-à-vis IB under the Customer Agreement, including declarations: (1) that IB is obligated under the Customer Agreement to calculate portfolio margin requirements by considering only those financial instruments that are approved by FINRA Rule 4210; (2) that IB has calculated portfolio margin requirements in a manner that considers ETNs, which are not authorized under FINRA Rule 4210; (3) that IB must, going forward, calculate portfolio margin requirements in strict conformity to FINRA Rule 4210, and therefore IB must not consider ETN positions for calculating portfolio margin requirements.

129.    In addition to the declaration described above, Plaintiffs and the Class are now suffering, and will continue to suffer, irreparable injury from IB's acts, in the form of exposure to excessive risk in portfolio margin trading.

130.    Plaintiffs and the Class have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein.  As such, Plaintiffs seek injunctive relief on behalf of themselves and members of the Class to bar IB from continuing to calculate portfolio margin requirements in a manner inconsistent with FINRA Rule 4210.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that the Court grant Plaintiffs and all Class members the following relief against the Defendant:

A.    For all recoverable compensatory and other damages sustained by Plaintiffs and the Class, to the extent not adjudicated in separate proceedings;

B.      For the disgorgement of all profits stemming from fees and commissions collected by IB associated with margin loans and trades in Portfolio Margin Accounts where ETN positions were subjected to portfolio margin treatment;

C.      A declaratory judgment that IB violated the terms of the Customer Agreement;

D.      An injunction preventing IB from calculating portfolio margin requirements using ETN positions, going forward;

E.      An award of attorneys' fees and costs to counsel for Plaintiffs and the Class;

F.      An order certifying this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23, establishing an appropriate Class or Classes and any Subclasses the Court deems appropriate, finding that Plaintiffs are proper representatives of the Class, and appointing the lawyers and law firms representing Plaintiffs as counsel for the Class;

G.      Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all counts so triable.

Dated: December 1, 2017

**KAPLAN FOX & KILSHEIMER LLP**

By:  /s/ *Frederic S. Fox*
                Frederic S. Fox

Frederic S. Fox
Email: ffox@kaplanfox.com
Donald R. Hall, Jr.
Email: dhall@kaplanfox.com
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone:  (212) 687-1980
Facsimile:  (212) 687-7714

- 30 -

**MEYER WILSON CO., LPA**
David Meyer
Email: dmeyer@meyerwilson.com
Matthew R. Wilson
Email:  mwilson@meyerwilson.com
Michael J. Boyle, Jr.
Email:  mboyle@meyerwilson.com
1320 Dublin Road, Ste. 100
Columbus, Ohio 43215
Telephone:  (614) 224-6000
Facsimile:  (614) 224-6066
(*pro hac vices* to be filed)

**SHEPHERD, SMITH, EDWARDS & KANTAS, LLP**
Samuel B. Edwards
Email: sedwards@sseklaw.com
David W. Miller
Email: dmiller@sseklaw.com
1010 Lamar, Suite 900
Houston, TX  77002
Telephone: (713) 227-2400
Facsimile: (713) 227-7215
(*pro hac vices* to be filed)

**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King
Email: lking@kaplanfox.com
Matthew B. George
Email: mgeorge@kaplanfox.com
350 Sansome St., Suite 400
San Francisco, CA 94104
Telephone: (415) 772-4700
Facsimile: (415) 772-4707
(*pro hac vice* to be filed)

*Attorneys for Plaintiffs and the Proposed Class*