## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| HEATHER HAUPTMAN, AND TIMOTHY MOSS, individually and on behalf of others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>INTERACTIVE BROKERS, LLC,<br><br>        Defendant. | Civil No. 17-cv-9382<br><br>**CORRECTED<br>CLASS ACTION COMPLAINT**<br><br>Jury Trial Demanded |

Plaintiffs Timothy Moss and Heather Hauptman ("Plaintiffs"), individually and on behalf of all others similarly situated, allege on personal knowledge, investigation of their counsel, and on information and belief, as follows:

### NATURE OF ACTION

1.      Plaintiffs bring this action for breach of contract, promissory estoppel, negligence, breach of the covenant of good faith and fair dealing, unjust enrichment, and declaratory relief, seeking legal and equitable remedies, resulting from the unlawful actions of Interactive Brokers, LLC (hereinafter referred to as "IB" or "Defendant"), in connection with IB's improper administration of their Portfolio Margin Accounts and the Portfolio Margin Accounts of all other similarly situated investors.

2.      "Portfolio margin" is a relatively new type of investment lending that employs a complex methodology for calculating margin requirements and generally allows for the use of higher leverage than standard "strategy-based" margin lending (commonly referred to as "Regulation T" margin lending).  The U.S. Securities and Exchange Commission ("SEC") and the

regulatory predecessor to the Financial Industry Regulatory Authority ("FINRA")[1] amended FINRA Rule 4210 in 2007 to allow, for certain types of securities, portfolio margin trading in retail customer accounts. Specifically, and as explained in detail herein, Rule 4210(g) provides that broker-dealers may use portfolio margin to calculate margin requirements using a "risk-based" model, only in relation to specifically enumerated security types. This risk-based approach results in margin requirements that account for "offsetting" or "hedged" positions, and thus allows for potentially greater leverage to be utilized in an account. With the potential for substantially greater leverage and the use of complex mathematical calculations to determine the margin requirements, however, the potential risk to the investor in a Portfolio Margin Account can also be substantially greater.

3.      In light of the increased potential risks to the investor associated with portfolio margin trading, the SEC and FINRA promulgated clear and explicit rules regarding which securities may be properly considered under a "risk-based" model for purposes of determining margin requirements in Portfolio Margin Accounts. FINRA rules limit portfolio margin eligibility to specific investment product categories, such as equity-based securities, and derivatives on eligible equity securities — like options or warrants on equities.

4.      IB, however, disregarded this rule in administering its customers' Portfolio Margin Accounts. Instead, IB provides portfolio margin treatment for Exchange Traded Notes ("ETNs"), such as the Barclays Bank PLC iPath S&P 500 VIX Short-Term Futures ETN, traded under the symbol (and more commonly known as) the VXX. ETNs, and the VXX in particular, are not equities or (derivatives of equities), but instead are unsecured debt instruments. In the case of the

---

[1] FINRA is a self-regulatory organization ("SRO") for brokerage firms and securities markets, empowered pursuant to 15 U.S.C. § 78o-3(b). It is the successor in interest to, among other entities, the National Association of Securities Dealers, Inc. ("NASD"). In its capacity as a regulator, FINRA writes and enforces the rules governing the activities of the almost 4,000 broker-dealers in the United States, including Defendant IB. *See* http://www.finra.org/about (last visited 10/11/2017). Pursuant to 15 U.S.C. § 78s, FINRA's rules are reviewed and approved by the SEC.

VXX, for example, there is no equity position supporting the security.  Instead, the value of the VXX is designed to track the movement of futures on an index that measures overall market volatility.  As unsecured debt instruments that do not represent ownership of any underlying asset, ETNs – like the VXX – are not among the approved list of investment products eligible for portfolio margin.

5.     IB was informed directly and on several occasions, by both FINRA regulators and the Options Clearing Corporation (the "OCC"), that unsecured debt instruments such as the VXX are ineligible for portfolio margin and risk-based margining treatment.  By continuing to provide portfolio margin's risk-based margining treatment for open positions in ETNs and options on ETNs – such as the VXX – IB knowingly violated FINRA rules to its customers' detriment, and knowingly breached its contractual agreements with its customers which obligated IB to follow FINRA rules and other industry regulations.

6.     Additionally, the disclosure form required by FINRA and provided by IB to its customers specifically lists each category of investment product that may be included for purposes of calculating portfolio margin requirements.  ETNs are absent from that disclosure form.

7.     The FINRA rule restricting portfolio margining to only certain types of products is important.  As FINRA informed IB, regulators promulgated Rule 4210(g) to exclude ETNs, such as the VXX, because the inherent risks associated with ETNs make them inappropriate for risk-based margin treatment.  By including these inappropriate financial products in risk-based margin calculations, IB exposed its customers to the same excessive investment risk that FINRA rules, which the SEC formally approved, were designed to avoid.

8.     Furthermore, through its disclosures and other communications, IB informed its clients that ETNs would not be afforded portfolio margin treatment.  Yet, IB violated FINRA rules,

ignored its own disclosures and exposed its customers to the very risks regulators sought to avoid when they approved the FINRA rules that IB agreed to follow.  Unfortunately, these risks materialized.  For example, Plaintiffs and other similarly-situated persons experienced a "blow out" (margin trading losses due to forced liquidation of positions) when the Dow Jones Industrial Average suddenly dropped by over 1,000 points on August 24, 2015, causing a spike in the VXX, as is more specifically recounted herein.

9.       By way of this class action lawsuit, Plaintiffs seek to vindicate the rights of themselves and all similarly-situated persons who had Portfolio Margin Accounts with IB at any time from December 1, 2011, through the date of judgment herein, in which portfolio margin treatment was applied to positions in or options on ETNs ("the putative Class").

## JURISDICTION AND VENUE

10.       This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA") codified as 28 U.S.C. § 1332(d)(2).  The matter in controversy exceeds $5,000,000, in the aggregate, exclusive of interest and costs.

11.       This Court has jurisdiction over IB because IB does substantial business in this District.  Furthermore, IB consented to this Court's jurisdiction pursuant to the Interactive Brokers LLC Customer Agreement ("Customer Agreement") (attached hereto as Exhibit 1) between itself and Plaintiffs.  Under the Customer Agreement (in ¶ 32), all disputes between IB and its customers are "governed by the laws of the State of New York" and the "Courts of New York have exclusive jurisdiction over disputes relating to this Agreement, except when arbitration is provided."

12.       Venue is proper in the United States District Court for the Southern District of New York under 28 U.S.C. §§ 1391(b) and (c) because a substantial part of the events or omissions giving rise to the claims asserted occurred in this District, and Defendant is deemed to reside in

any judicial district in which it is subject to personal jurisdiction at the time the action is commenced. Also, as alleged above, the Customer Agreement provides that the Courts of New York are the exclusive venue for any disputes arising under that Agreement.

**PARTIES**

13.     Plaintiff Timothy Moss is, and was at all times mentioned herein, an individual citizen of the State of Colorado, and currently resides in that state.

14.     Plaintiff Heather Hauptman is, and was at all times mentioned herein, an individual citizen of the State of Colorado, and currently resides in Argentina.

15.     Defendant Interactive Brokers, LLC is a Connecticut corporation with its headquarters and principal place of business in Greenwich, Connecticut.

**FACTUAL ALLEGATIONS**

**Margin Trading and Portfolio Margin Accounts**

16.     Margin trading is a practice by which investors are able to leverage their existing portfolio of securities and cash in order to purchase or sell additional securities.  In non-margin trading, the maximum risk of loss to the investor in any particular position is the amount of money put into the account to purchase that position.  In margin trading, the investor risks the principal, in addition to any money loaned by the broker-dealer.

17.     In light of this risk, margin trading is subject to FINRA rules and requirements designed to protect investors and the public interest.[2]  In particular, all margin accounts have a "margin requirement," which represents the minimum equity value that must be in the account at

---

[2] The statutory basis for the promulgation of FINRA Rule 4210(g) explains that, "FINRA believes that the proposed rule change is consistent with the provisions of Section 15(A)(b)(6), which requires, among other things, that the FINRA rules must be designed to prevent fraudulent and manipulative acts and practices, *to promote just and equitable principles of trade, and in general to protect investors and the public interests.*" Securities and Exchange Commission, SR-2008-041 at 5 (emphasis added).

any time to serve as collateral. For example, a margin requirement of 50% means that a hypothetical investor must maintain equity in the margin account equal to 50% of the total value of the assets in the portfolio.

18. If the account falls below the margin requirement, the broker-dealer or other financial institution administering the account may issue a "margin call." When a margin call is issued, the investor must put additional capital into the account to bring it up to the margin requirement, liquidate positions and turn the proceeds over to the broker-dealer to retire a portion of the margin debt, or some combination of the two.

19. Margin requirements are designed to control and manage the risk of margin trading. The higher the ratio between account value and the amount of the portfolio financed by the financial institution, the lower the risk that an investor will be forced to "pay out of pocket" to make the financial institution whole in the event of a decline in the value of the financial instruments that comprise the account. Correspondingly, the lower the margin requirement, the greater the risk that the investor will suffer a large loss in the event of a decline in value of the positions that make up the account. As such, the margin requirement represents an assessment of the acceptable amount of risk allowed under regulations for positions in a margin account.

20. Portfolio margining is a relatively new methodology for determining margin requirements and was authorized by the SEC and FINRA (f/k/a the NASD) in 2007 for use by retail investors. Portfolio margin differs from traditional margin by virtue of the manner in which the margin requirement is calculated. Under traditional "strategy-based" or "Regulation T" margining, the margin requirement is typically determined by a formula that is a function of the size and market price of each position. Portfolio Margin requirements differ from Regulation T margining in that they are calculated using a complex statistical model that assesses the potential

volatility of each security, and then measures the potential impact of various price movements on a portfolio as a whole. The calculations that inform Portfolio Margin requirements are created according to a methodology known as the Theoretical Intermarket Margining System ("TIMS model"), and the data from the TIMS model is distributed to broker-dealers by the OCC after the close of trading on each trading day. Broker-dealers then apply the data from the TIMS model to their customers' Portfolio Margin positions to determine each customer's Portfolio Margin requirement. The margin requirement determined according to the TIMS model reflects the regulatory minimum for Portfolio Margin Accounts.

21.    One of the primary ways that the portfolio margin model differs from the traditional model is by considering the risk of "hedged" positions. Hedged positions are two or more securities that normally react in an offsetting manner according to market movements, and are generally designed to reduce risk.

22.    Because Portfolio Margin requirements are calculated in a manner that assesses the relative risk profile of a particular portfolio (at least in theory), Portfolio Margin Accounts that are "hedged" allow for a level of leverage to the account holder that is potentially far greater than would be available under a standard strategy-based margin model. For instance, on information and belief, IB allows the gross position value of a Portfolio Margin Account to reach as high as 50 times the net liquidating value, or equity, of the account.

**FINRA Regulations of Portfolio Margin Trading**

23.    Margin trading is governed by FINRA Rule 4210. As discussed above, FINRA, with the approval of the SEC, amended Rule 4210 in 2007 to authorize Portfolio Margin trading.[3]    FINRA Rule 4210(g) specifically governs Portfolio Margin. The SEC and FINRA

---

[3] Portfolio Margin began as a pilot program under the NASD on April 2, 2007, and the SEC allowed FINRA to make portfolio margin permanent in 2008.

designated which securities may be afforded portfolio margin or "risk-based" margin treatment. Rule 4210(g)(6)(B)(i) delineates precisely what types of financial products are eligible for Portfolio Margin treatment. Specifically:

> For eligible participants . . ., a transaction in, or transfer of, an eligible product may be effected in the portfolio margin account. Eligible products under this paragraph (g) consist of:
>
>> a. a margin *equity security* (including a foreign equity security and option on a foreign equity security, provided the foreign equity security is deemed to have a "ready market" under SEA Rule 15c3-1 or a "no-action" position issued thereunder, and a control or restricted security, provided the security has met the requirements in a manner consistent with Securities Act Rule 144 or an SEC "no-action" position issued thereunder, sufficient enough to permit the sale of the security, upon exercise or assignment of any listed option or unlisted derivative written or held against it, without restriction);
>>
>> b. a listed option on an *equity security* or index of *equity securities*;
>>
>> c. a security futures product;
>>
>> d. an unlisted derivative on an *equity security* or index of *equity securities*;
>>
>> e. a warrant on an *equity security* or index of *equity securities*;
>>
>> f. a related instrument as defined in paragraph (g)(2)(D) [i.e., as "broad-based index futures and options on broad-based index futures covering the same underlying instrument."][4]

24.     FINRA has issued further guidance on the types of financial products to be considered when calculating portfolio margin requirements, reinforcing that:

> All margin *equity securities* (as defined in Section 220.2 of Regulation T of the Board of Governors of the Federal Reserve System), warrants on margin *equity securities* or on eligible indices of *equity securities*, equity-based or equity-index based listed options, and security futures products (as defined in Section 3(a)(56) of the Securities Exchange Act of 1934) are eligible to be margined in a portfolio margin account. In addition, a customer that has an account with equity of at least five million dollars may establish and maintain positions in unlisted derivatives (e.g., OTC swaps, options) on a margin equity security or an eligible index of equity

---

[4] FINRA Rule 4210 (g)(6)(B)(i) (emphases added).

*Footnote continued on next page*

securities that can be priced by a theoretical pricing model approved by the Securities and Exchange Commission ("SEC").[5]

25.     In sum, FINRA Rule 4210(g)(6)(B) and associated guidance stands for the proposition that only **equity securities**, and options or derivative products derived from equity securities or equity-based indices, are eligible for treatment under the portfolio margin methodology.  The margin requirement for products ineligible for portfolio margin, such as ETNs, must be calculated according to the far more restrictive Regulation T requirements.

**Exchange Traded Notes**

26.     An ETN is not an equity security, but rather an **unsecured debt** instrument traded on the major stock exchanges.  ETNs function in some respects like a promissory note — the investor pays money to the financial institution issuing the ETN, and upon maturity, the investor receives a payment of money in return.  But unlike a traditional promissory note, which regularly pays a fixed amount upon maturity plus interest, the value of ETN upon maturity is pegged to a particular market index and subject to the creditworthiness of the issuer of the note.  Therefore, an ETN is an investment on the future state of the market, or a particular aspect of the market, at the time the ETN matures, as well as a stake on the ability of the issuing bank to avoid defaulting on the note prior to maturity.

27.     An example of an ETN is the Barclays Bank PLC iPath S&P 500 VIX Short-Term Futures ETN, traded under the stock symbol VXX.  The VXX is tied to a spread of short-term futures contracts related to the CBOE Volatility Index (ticker symbol VIX), a popular measure of the implied volatility of the S&P 500 index.   The CBOE Volatility Index represents one measure of the market's expectation of stock market volatility over the next 30-day period.

---

[5] FINRA Regulatory Notice 08-09 (herein after referred to as "FINRA NTM 08-09") (March 14, 2008) (emphases added).

28.     In short, the VXX note is derived from futures contracts on the VIX index, which in turn are derived from the VIX index, which in turn is derived from an indexed calculation of the volatility of the market as a whole, which in turn is derived from the action of individual equities in the market.  The structure of the VXX means that fluctuations in the broader securities market have a disproportionately large impact on the VXX.  Because the VXX, like all ETNs, is securitized and traded on an exchange, the price of VXX notes move on a continuous basis in response to changes in market conditions.

29.     The VXX and other ETNs are not eligible products for portfolio margin treatment, according to FINRA Rule 4210(g)(6)(B).  In contrast ETNs are *debt* instruments, in which the issuing financial institution owes a debt to the holder of the note.  The FINRA rule limits Portfolio Margin treatment to equity-based securities; debt instruments such as the VXX note and options on VXX notes are ineligible for Portfolio Margin treatment.

30.     FINRA has made it clear to brokers (including, specifically, IB) that ETNs are not eligible for consideration in calculating Portfolio Margin requirements.  In an email to David Battan, General Counsel and Executive Vice President of IB, Steve Yannolo from FINRA Credit Regulation stated: "[i]t was recently brought to our attention that the OCC is providing P/L for ETNs.  *Since these are debt instruments, they are ineligible for portfolio margin.*"  This was reiterated in a follow-up email to Mr. Battan and other IB employees from Mr. Yannolo the following day that states "because of the[ir] inherent risk," ETN products (such as the VXX) "should not get a risk-based treatment, as they are debt products and not eligible for portfolio margin."  Instead, Yannolo explained FINRA "expect[ed] firms" such as IB "to apply higher strategy-based margin requirements" to such products.  Additionally, in a prior proceeding, IB's own expert witness, the FINRA Managing Director of Credit Regulation and co-author of FINRA

NTM 08-09, testified that ETNs do not fit the definition of "Eligible Investments" for Portfolio

Margin under SEC approved FINRA rules or IB's own Portfolio Margin Disclosure.[6]

**IB'S Administration of Portfolio Margin Accounts**

31.     Interactive Brokers, LLC, is the largest subsidiary of the publicly traded company

Interactive Brokers Group, Inc.  IB is an electronic-only broker-dealer and trading platform and is

one of the largest such entities in the United States.  IB is regulated by FINRA and subject to

FINRA rules.

32.     When a customer opens an account with IB to engage in trades, he or she agrees to

the "Interactive Brokers LLC Customer Agreement," which provides in part: "**All transactions**

**are subject to rules and policies of relevant markets and clearinghouses, and applicable laws**

**and regulations.**"[7]  This provision contractually obligates IB to conduct trades on the basis of

"applicable laws and regulations," which includes relevant FINRA rules.

33.     In addition, under the section labeled "Margin," the Customer Agreement states

that "[m]argin transactions are subject to initial and maintenance margin requirements of

exchanges, clearinghouses ***and regulators*** and also to any additional margin requirement of IB,

which may be greater."[8]  Thus, once again, the Customer Agreement contractually obligates IB to

conduct margin transactions in accordance with the margin requirements of regulators such as

FINRA.

---

[6] In sworn testimony in FINRA Case No. 15-03035, Rudolph Verra, the FINRA Managing Director of
Credit Regulation through December of 2013 previously testified to the following:
Q: And do you see there where it says positions eligible for a portfolio margin accounts"?
A. (Verra):  Yes, I do.
Q. I just want to make sure we are clear.
A. (Verra):  Uh-Huh.
Q. Do ETNs, Exchange Traded notes, fit any category there in paragraph 4 [of FINRA NTM 08-09]?
A. (Verra):  No.
[7] Ex. 1 at ¶ 6 (emphasis added).
[8] *Id.* at ¶ 11(B) (emphasis added).

*Footnote continued on next page*

34.     Finally, that same section of the Customer Agreement states that the "[c]ustomer represents that he or she has read the 'Disclosure of Risks of Margin Trading' provided separately by IB."[9]  The "Portfolio Margin Risk Disclosure Statement,"[10] describes the limitations governing which positions in an account may be subject to Portfolio Margin calculations.  Specifically, under "Positions Eligible for a Portfolio Margin Account," the disclosure states:

> All margin equity securities (as defined in Section 220.2 of Regulation T of the Board of Governors of the Federal Reserve System), warrants on margin equity securities or on eligible indices of equity securities, equity-based or equity-index based listed options, and security futures products (as defined in Section 3(a)(56) of the Securities Exchange Act of 1934) are eligible to be margined in a portfolio margin account. In addition, a customer that has an account with equity of at least five million dollars may establish and maintain positions in unlisted derivatives (e.g., OTC swaps, options) on a margin equity security or an eligible index of equity securities that can be priced by a theoretical pricing model approved by the Securities and Exchange Commission ("SEC").[11]

35.     The language in the disclosure is a word-for-word copy of the FINRA NTM 08-09, the regulatory guidance interpreting FINRA Rule 4210.  As such, IB's Portfolio Margin Risk Disclosure Statement warrants and represents that all transactions will be conducted in accordance with FINRA's Portfolio Margin requirement calculation guidelines, and explicitly lists the only securities eligible to receive portfolio margin treatment.  Unsecured debt securities, like ETNs, are not included.

36.     Additionally, in or around April 2014, IB published on its website a notice stating that ETNs were not eligible for Portfolio Margin treatment, and that IB would not provide Portfolio Margin for ETNs, including, but not limited to, the VXX.[12]  Such notice remained on IB's website until January 2016.

---

[9] *Id.* at ¶ 11(A).
[10] *See* Ex. 2.
[11] *Id.* at ¶ 4.
[12] *See* Ex. 3.

37.     It turns out, however, that during the Class Period, IB calculated the margin requirement for ETNs in its customers' Portfolio Margin Accounts in a manner that applies risk-based margin requirements, despite the fact that by IB's own admission ETNs are not eligible for Portfolio Margining.   As such, IB is acting in a manner directly contrary to its Customer Agreement, its own disclosures, and FINRA regulations that IB is contractually obligated to follow.

38.     As stated above, FINRA specifically informed IB in early 2014 that ETNs were not eligible for Portfolio Margin treatment.   As a result, IB was unquestionably aware in early 2014 that it was administering its accounts in a manner inconsistent with the Customer Agreement, its own disclosures, and FINRA regulations.   Nevertheless, IB continued to include ETNs in its calculations of Portfolio Margin requirements even after being informed that the practice violated FINRA Rule 4210.  On information and belief, IB continues to include ETNs in the calculation of Portfolio Margin requirements as of the date of this filing.

**Losses Suffered Because of IB'S Wrongful Conduct**

39.     Margin trading functions similarly to a line of credit extended by the broker-dealer to the customer.  Just as a reduction in the value of a mortgaged home reduces the equity in the home, but not the amount owed on the mortgage, a loss in the value of the financial products in a margin account reduces the value of the customer's collateral in the account.  This can result in a negative equity situation (i.e., the loan against the account is more than the value of the positions in the account).  Further, because of the use of leverage through margin, losses accumulate more rapidly.   In the case of investments that are made pursuant to Portfolio Margin, because of the substantially higher leverage provided, a small move in market prices can result in massive losses (or gains) in an account.

40.     Both the traditional strategy-based margin requirements, but especially the newer risk-based margin requirements, are based on complex formulas and models which can vary from security to security.  IB customers rely on IB's trading interface and the calculations IB's systems perform in order to determine the margin requirements and margin compliance of the customer's portfolio.  In fact, because of the complexity associated with margin calculations, especially portfolio margin calculations, IB's customers are wholly reliant on IB to report the margin requirements to them.  Likewise, IB prides itself on its sophisticated trading interface and publicly touts that its trading software offers traders a superior platform for monitoring risk and executing trades.

41.     Because IB customers are reliant upon IB to calculate the margin requirements for their portfolios, and because IB applies the incorrect margin calculations for ETNs in a Portfolio Margin Account, IB allows and executes margin trades that are not permitted by FINRA regulations and the Customer Agreement.  Furthermore, these improper trades greatly increase the risk to IB's clients.  In addition to the increase in risks, the additional leverage afforded by IB increases the commissions, interest and fees assessed to its portfolio margin customers.  Because IB knowingly violated industry rules in allowing trades, any losses from those trades are directly attributable to IB's violation.

**Facts Relating to Named Plaintiffs**

42.     Heather Hauptman is a long-time resident of Colorado who currently lives in Argentina.  Ms. Hauptman engaged the services of a financial advisory firm, Meridian Capital Advisors, LLC ("Meridian"), and provided them with discretionary authority over her investments.[13]

---

[13] A discretionary account allows a financial advisor to make trades in an investor's account without prior approval or authorization from the investor for any trading.

43.     On or about June 19, 2015, Ms. Hauptman, at the recommendation of her financial advisor, opened an account with IB and signed the Customer Agreement.  That same day, she signed the Portfolio Margin Risk Disclosure Statement.  *See* Exhibits 1 and 2.

44.     Ms. Hauptman's account included VXX positions. Unbeknownst to Ms. Hauptman, IB immediately began to improperly apply Portfolio Margin treatment to her VXX positions. Meridian maintained and traded positions in the VXX in Ms. Hauptman's Portfolio Margin Account for approximately three months.  For example, on August 21, 2015, Meridian sold 125 call options on the VXX and purchased 125 put options on the VXX in Ms. Hauptman's account.[14] By selling calls and buying puts on the VXX, Meridian was taking a "short" position in the VXX. If the price of the VXX dropped or stayed the same prior to expiration of the contracts, Ms. Hauptman would benefit in two ways: (1) the call options would expire worthless, allowing Ms. Hauptman to keep the premium collected from the sale of those options; and (2) the put options would benefit from an increase in value.  If the price of the VXX rose, however, then Ms. Hauptman would be required to deliver notes of the VXX to the buyer of the call options and would lose 100% of the funds used to purchase the put options.  Moreover, Ms. Hauptman would be required to purchase VXX notes on the open market and deliver them to the buyer of the call options.  In such a case, Ms. Hauptman's loss would be the difference between the market price at which she was forced to purchase the VXX notes, and the "strike" price of the option.  Meridian's VXX option trades on August 21, 2015 hinged on the expectation that the VXX price would fall.

45.     Ms. Hauptman's trades in the VXX options occurred in her Portfolio Margin Account, and IB applied the risk-based margin model (rather than the strategy-based margin model) to calculate the margin requirements for the ETN positions.

---

[14] Each option contract represents 100 notes of the VXX.  Thus, Meridian sold call options on 12,500 VXX notes and bought put options on 12,500 notes of the VXX.

46.     As of the end of day on August 21, 2015, the total value in Ms. Hauptman's Portfolio Margin Account was in excess of $200,000.

47.     Timothy Moss is a similarly affected investor.  Like Ms. Hauptman, Tim Moss also engaged Meridian and gave it discretionary authority over his investments.  His savings had been with Meridian since 2011.  Outside of his investments managed by Meridian, he had limited investment experience.  As Meridian managed both the Plaintiffs' accounts, the trading in each of the accounts was very similar.  Like Ms. Hauptman, Meridian was trading the VXX and options, as well as other securities, on the VXX in Mr. Moss's account.  As in Ms. Hauptman's account, IB applied Portfolio Margin requirements to Mr. Moss's VXX positions.

48.     At the beginning of August of 2015, Mr. Moss' account held numerous positions including VXX and options on the VXX.  As in Ms. Hauptman's account, Meridian shorted 128 VXX calls on August 21, 2015.  IB calculated the margin requirement for this trade using Portfolio Margin.  At the end of the day on August 21, 2015, the Mr. Moss' account was valued at approximately $186,000.

49.     Over the weekend after August 21, 2015, events unfolding in the Asian markets began to impact the American markets, and U.S. stock futures began to drop.  At around 12:00 AM on the morning of August 24, 2015, IB changed the margin requirements, increasing the margin requirement for the VXX and VXX option positions for all of its clients, including Plaintiffs.[15]  When the market opened on August 24, 2015, the Dow index dropped 1,000 points and the price of the VXX spiked.   As a result, the value of Plaintiffs' Portfolio Margin Accounts (and those of all similarly situated IB customers) dropped.  Further, because IB had so dramatically

---

[15] The exact increase of Plaintiffs' margin requirement is unknown, but on information and belief, similarly-situated customers had the margin requirement on VXX short call positions instantaneously increased by as much as 600%.

increased the Portfolio Margin requirements, many customers were put into a margin deficiency situation.

50.     In response to the massive increase in the margin requirement, coupled with the decrease in the account value, from August 25 to August 31, IB force liquidated most of the positions in Plaintiffs' accounts, resulting in large losses.  In the month of August, Ms. Hauptman's account lost over $175,000, primarily as a result of the VXX and VXX option trades that occurred using Portfolio Margin leverage.  Likewise, in the month of August, the Mosses lost around $150,000, with most of the losses due to VXX and VXX option trades that occurred using portfolio margin leverage.

51.     This scenario was not unique to Plaintiffs, and, in fact, occurred in many other IB accounts that week.  In a number of cases, the VXX trades and subsequent liquidations resulted in margin deficiencies.  In a twist of irony, IB invoked FINRA Rule 4210 and its portfolio margin disclosures and customer agreements—the very rule and agreements it breached when it applied portfolio margin requirements to the VXX—in order to collect on the margin deficiencies from some of its customers.

52.     Fortunately, in the instant case, IB's actions did not result in these Plaintiffs owing a margin debt to IB.  Unfortunately, like many IB customers, Plaintiffs saw their accounts lose most of their value in August 2015 as a direct result of IB's improper portfolio margining.

53.     In short, having only been customers of IB for less than four months, Plaintiffs suffered losses equal to approximately 85% of their accounts' values.

## CLASS ACTION ALLEGATIONS

54.     Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein.

55.    Plaintiffs bring this action individually and on behalf of all other persons similarly situated (hereinafter referred to as "the Class") pursuant to Federal Rule of Civil Procedure 23.

56.    Plaintiffs propose the following Class definition, subject to amendment as appropriate:

> All persons who held a Portfolio Margin Account with Interactive Brokers, LLC, containing a position or option in an ETN at any point from December 1, 2011 through the date of judgment, and whose ETN positions received Portfolio Margin treatment.

Collectively, all these persons will be referred to as "Class members."  Plaintiffs represent, and are members of, the Class.  Excluded from the Class are Defendant, and any entities in which Defendant has a controlling interest, and Defendant's agents and employees, and any Judge to whom this action is assigned and any member of such Judge's staff and immediate family.

57.    Plaintiffs do not know the exact number of members in the Class, but reasonably believe that Class members number, at a minimum, to be more than 1,000.

58.    Plaintiffs and members of the Class have been harmed and/or continue to be harmed by the acts of Defendant.

59.    Plaintiffs seek injunctive and declaratory relief on behalf of themselves and all Class members, as well as damages in their individual capacity.

60.    The joinder of all Class members is impracticable due to the number of Class members.

61.    Additionally, the disposition of the claims in a class action will provide substantial benefit to the parties and the Court by avoiding a multiplicity of identical suits, as well as

inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class.

62.     Further, the Class can be identified easily through records maintained by the Defendant.

63.     There are well-defined, nearly identical, common questions of law and fact affecting all parties.

64.     The questions of law and fact, referred to above, involving the class claims predominate over questions that may affect individual Class members.

65.     Such common questions of law and fact include, but are not limited to, the following:

        a.     Whether positions or options in ETNs qualify for portfolio margin treatment under FINRA rules;

        b.     Whether IB includes positions or options in ETNs in its portfolio margin calculations;

        c.     Whether IB was aware that it was including positions or options in ETNs in its portfolio margin calculations, in violation of Portfolio Margin rules;

        d.     Whether IB breached its Customer Agreement with its customers by including positions or options in ETNs in its portfolio margin calculations;

        e.     Whether Plaintiffs and the Class are entitled to a declaratory judgment that IB breached its Customer Agreement with its customers by including positions or options in ETNs in its portfolio margin calculations;

        f.     Whether IB promised its customers that it would calculate portfolio margin requirements in a manner consistent with FINRA rules;

g.      Whether IB's statement in its Portfolio Margin Risk Disclosure Statement with regard to how it would calculate portfolio margin requirements constituted a promise made to its customers;

h.      Whether IB broke its promises to customers by including positions or options in ETNs in its portfolio margin requirement calculations;

i.      Whether the duty that IB owed to its customers included that IB would exclude positions or options in ETNs from its portfolio margin calculations;

j.      Whether IB breached that duty by including positions or options in ETNs in its portfolio margin calculations;

k.      Whether IB breached the covenant of good faith and fair dealing by including positions or options in ETNs in its portfolio margin calculations;

l.      Whether IB should be enjoined from giving positions or options in ETNs portfolio margin treatment in the future.

66.     The claims of Plaintiffs are typical of the claims of the Class they seek to represent. Plaintiffs and other Class members held Portfolio Margin Accounts including positions or options in ETNs during the Class Period.

67.     Plaintiffs will fairly and adequately represent and protect the interests of the Class.

68.     Plaintiffs have no interests which are antagonistic to any member of the Class.

69.     Plaintiffs have retained counsel experienced in handling class action claims involving breaches of contract and violations of SEC and/or FINRA rules.  Plaintiffs' counsel are also experienced in prosecuting the claims of investors against their broker-dealers.

70.     Common issues predominate over any individual issues.  The focus of these claims is on IB's conduct, which did not vary as between class members.  Resolution of these common

questions will drive the claims of all Class members toward judgment or resolution: they involve a "fatal similarity" for purposes of the claims of all class members.

71.     A class action is the superior method for the fair and efficient adjudication of this controversy.

72.     Class-wide relief is essential to compel IB to comply with the relevant FINRA rules regarding Portfolio Margin Accounts, and abide by its contracts and agreements.

73.     Plaintiffs therefore seek certification of the Class pursuant to Rules 23(b)(1)(A), (b)(2), and (b)(3).   Plaintiffs seek certification of a Rule 23(b)(1)(A) class.   Adjudicating IB's liability for the facts and claims alleged here poses a substantial risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for IB if a class is not certified.

74.     Plaintiffs seek certification of an injunctive and declaratory relief class pursuant to Rule 23(b)(2).   IB has acted on grounds generally applicable to the Class, and the violations complained of herein are substantially likely to continue in the future if an injunction is not entered. Therefore, final injunctive relief and corresponding declaratory relief with respect to the Class as a whole is appropriate.

75.     Plaintiffs seek certification of a Rule 23(b)(3) class.   As detailed above, common questions regarding IB's conduct predominate over any individual issues, and a class action is superior to the alternative of hundreds or thousands of individual cases involving the same core facts and claims.

76.     In the alternative, Plaintiffs seek certification of an "issues" class pursuant to Rule 23(c)(4).   This class would incorporate, and allow for the adjudication of, all issues the Court

adjudges to be common to members of the class and subclass, such as one or more of the common issues identified by Plaintiffs in ¶ 65, *supra*.

**CAUSES OF ACTION**

**FIRST COUNT**

**Breach of Contract**

A.      **Breach of the Customer Agreement to Abide by applicable Rules and Regulations**

77.      Plaintiffs incorporate by reference the preceding paragraphs of this Complaint as if fully stated herein.

78.      In order to use the IB trading platform, a potential customer must enter into the Customer Agreement with IB, which "governs the relationship between Customer and [IB]." Ex. 1, at ¶ 1.  Therefore, Plaintiffs and each member of the Class entered into the Customer Agreement with IB.

79.      The Customer Agreement states that "[a]ll transactions are subject to . . . applicable laws and regulations." *Id.* at ¶ 6.

80.      The "applicable laws and regulations" referenced in paragraph 6 of the Customer Agreement includes FINRA Rule 4210 regarding the proper calculation of margin requirements for Portfolio Margin Accounts.

81.      In addition, the Customer Agreement specifically states that "Margin transactions are subject to initial and maintenance margin requirements of . . . regulators. . . ." *Id.* at ¶ 11(B). The "initial and maintenance margin requirements of . . . regulators" incorporates and includes FINRA Rule 4210 regarding the proper calculation of margin requirements for Portfolio Margin Accounts.

- 22 -

82. IB did not calculate margin requirements for the accounts of Plaintiffs and Class members in a manner consistent with FINRA Rule 4210. Specifically, IB's risk-based margin calculations included ETNs in contravention to that rule. Such products are, by the explicit terms of FINRA Rule 4210, not eligible to be considered for purposes of portfolio margin calculations.

83. By including ETNs in its calculation of portfolio margin levels for the accounts of Plaintiffs and Class members, and thus failing to abide by "applicable laws and regulations" and "margin requirements of . . . regulators," IB breached its Customer Agreement with Plaintiffs and members of the Class.

84. As such, IB breached its Customer Agreement with Plaintiffs and Class members.

85. IB's breach of the Customer Agreement resulted in losses to Plaintiffs and Class members, and continues to expose them to harm in the form of investment losses that would not have been realized if IB had fulfilled its obligations under the Customer Agreement.

86. These losses reflect damages to Plaintiffs and Class members in an amount to be proven at trial or in a separate proceeding or proceedings if necessary.

**B.   Breach of the Portfolio Margin Disclosure**

87. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint as if fully stated herein.

88. In order to open a portfolio margin account, a potential customer must acknowledge the FINRA mandated Portfolio Margin Disclosure modeled after FINRA NTM 08-09. Ex. 1. Such disclosure is incorporated by reference into the agreements governing the language between clients and IB. Therefore, Plaintiffs and each member of the Class entered are a party to the Portfolio Margin Disclosure with IB.

89. Paragraph 4 of the Portfolio Margin Disclosure details the only products eligible to receive portfolio margin treatment. Ex. 2, ¶ 4. ETNs are not included in that definition. Such

disclosure constitutes an agreement between Plaintiffs and each member of the Class that IB would not apply portfolio margin to products other than those listed in Paragraph 4 of the Portfolio Margin Disclosure.

90.     By including ETNs in its calculation of portfolio margin levels for the accounts of Plaintiffs and Class members, and thus failing to abide by the terms of the Portfolio Margin Disclosure, IB breached its agreement with Plaintiffs and each member of the Class.

91.     IB's breach of the terms of the Portfolio Margin Disclosure resulted in losses to Plaintiffs and Class members, and continues to expose them to harm in the form of investment losses that would not have been realized if IB had fulfilled its obligations under the Portfolio Margin Disclosure.

92.     These losses reflect damages to Plaintiffs and Class members in an amount to be proven at trial or in a separate proceeding or proceedings if necessary.

## SECOND COUNT

## Promissory Estoppel

93.     Plaintiffs incorporate by reference the preceding paragraphs of this Complaint as if fully stated herein, except for the paragraphs in the other Counts, *infra* and *supra*.

94.     IB represented and promised to its customers in its Customer Agreement that it would conduct its calculation of portfolio margin requirements in a manner consistent with "applicable laws and regulations," Ex. 1, at ¶ 6, and "subject to initial and maintenance margin requirements of … regulators. . . ."  Id. at ¶ 11(B).

95.     In addition, IB's Portfolio Margin Disclosure Statement, which all customers must review and sign pursuant to the terms of the Customer Agreement (see id. at ¶ 11(A)), warrants that "[a]ll margin equity securities (as defined in Section 220.2 of Regulation T of the Board of

Governors of the Federal Reserve System), warrants on margin equity securities or on eligible indices of equity securities, equity-based or equity-index based listed options, and security futures products (as defined in Section 3(a)(56) of the Securities Exchange Act of 1934) are eligible to be margined in a portfolio margin account." Ex. 2, at ¶ 4.

96.    Also, IB made public representations through website postings that it would not apply portfolio margin to ETNs. Ex. 3.

97.    Plaintiffs and Class members justifiably relied on IB's representations that it would calculate portfolio margin requirements in a manner consistent with applicable rules, such as FINRA Rule 4210, and its own Portfolio Margin Disclosure Statement.

98.    IB failed to abide by "applicable laws and regulations" and the "margin requirements of . . . regulators," in the form of including ETNs in its portfolio margin calculations for Plaintiffs and Class Members.

99.    ETNs are not an equity security, nor a warrant or index of such securities, nor an option or a security future product.  Instead, ETNs are debt instruments.

100.    IB violated its own disclosures with regard to its customers with Portfolio Margin Accounts by including ETNs in IB's portfolio margin calculations.

101.    IB therefore violated its promise, set forth in the Customer Agreement, to abide by FINRA Rules with regard to the administration of Portfolio Management Accounts.

102.    IB therefore acted in contradiction to its public and private pronouncements that it would not apply portfolio margin to ETNs.

103.    As a direct and proximate result of IB's breach of its explicit promises, Plaintiffs and Class members suffered losses, in the form of investment losses that would not have occurred

if IB had fulfilled its promises.  These losses reflect damages to Plaintiffs and Class members at an amount to be proven at trial.

### THIRD COUNT

### Unjust Enrichment

104.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein, except for the paragraphs in the other Counts, *infra* and *supra*.

105.    By improperly calculating portfolio margin requirements to include ETN positions, IB overstated the amount of funds available to Plaintiffs and Class members to make margin-financed trades.  As a result of IB's improper calculation methodology, margin-financed trades were made by Plaintiffs and Class members that would not have occurred but for the improper calculations.

106.    IB received fees and/or commissions from every trade made by Plaintiffs and Class members on Portfolio Margin Accounts, including those trades that would not have been made but for the improper portfolio margin requirement calculations.

107.    Additionally, IB charged interest on the margin loans that would not have been allowed but for the improper portfolio margin requirement calculations.

108.    Also, IB received fees for lending securities for transactions that would not have been allowed but for the improper portfolio margin requirement calculations.

109.    IB has therefore been unjustly enriched by these trades and margin loans that would not and should not have happened if IB had utilized appropriate and FINRA mandated portfolio margin requirement rules.

110.    Plaintiffs and Class members conferred a benefit on IB of which IB had knowledge, as IB was aware that ETNs were not appropriate financial products for consideration in portfolio margin requirement calculation, as stated in FINRA rules.

111.    The circumstances are such that it would be inequitable, unconscionable, and unjust to permit IB to retain the benefit of moneys that it unfairly obtained from Plaintiffs and other members of the Class.

112.    Plaintiffs and Class members, having been harmed by IB's conduct, are entitled to recover funds as a result of the unjust enrichment of IB to their detriment.

## FOURTH COUNT

### Breach of the Implied Covenant of Good Faith and Fair Dealing

113.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein, except for the paragraphs in the other Counts, *infra* and *supra*.

114.    The implied covenant of good faith and fair dealing, which inheres in every contract, obligates IB to honor its representations that it would calculate portfolio margin requirements in a manner consistent with FINRA Rule 4210 and IB's own Portfolio Margin Risk Disclosure Statement.

115.    IB breached this covenant by including ETNs in the calculation of the portfolio margin requirements for Plaintiffs and Class members.

116.    As a direct and proximate result of IB's breach, Plaintiffs and Class members suffered losses that would not have occurred if IB had fulfilled its promises.

117.    These losses reflect damages to Plaintiffs and Class members in an amount to be proven at trial or in a separate proceeding or proceedings.

## FIFTH COUNT

### Negligence

118.    Plaintiffs incorporates by reference all other paragraphs of this Complaint as if fully stated herein, except for the paragraphs in the other Counts, *infra* and *supra*.

119.    IB had a duty to exercise reasonable care in conducting and facilitating transactions for its customers.

120.    IB's standard of care for its customers is codified in the form of regulations promulgated by FINRA, which has supervisory authority over broker-dealers and other entities in the financial industry.

121.    IB unlawfully breached this duty by knowingly incorporating ETNs into the calculation of portfolio margin requirements for its customers, in violation of FINRA Rule 4210.

122.    Defendant's negligent and wrongful breaches of its duties owed to Plaintiffs and Class members proximately caused losses, in the form of investment losses that would not have occurred if IB had shown due care toward its customers by following the FINRA rules for Portfolio Margin accounts

123.    These losses reflect damages to Plaintiffs and Class members in an amount to be proven at trial or in a separate proceeding or proceedings.

### SIXTH COUNT

### Declaratory and Injunctive Relief

124.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully stated herein, except for the paragraphs in the other Counts, *infra* and *supra*.

125.    There exists an actual controversy under the terms of the Customer Agreement, and applicable law governing the same, as to whether IB may consider ETNs in the calculation of portfolio margin requirements for Portfolio Margin Accounts.

126.    This question is common to Plaintiffs and Class members who seek a declaration of their rights and legal obligations in addition to such other relief which might be granted by this Court.

127.    Pursuant to 28 U.S.C. § 2201, this Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

128.    Plaintiffs and Class members are interested parties who seek a declaration of their rights and legal obligations vis-à-vis IB under the Customer Agreement, including declarations: (1) that IB is obligated under the Customer Agreement to calculate portfolio margin requirements by considering only those financial instruments that are approved by FINRA Rule 4210; (2) that IB has calculated portfolio margin requirements in a manner that considers ETNs, which are not authorized under FINRA Rule 4210; (3) that IB must, going forward, calculate portfolio margin requirements in strict conformity to FINRA Rule 4210, and therefore IB must not consider ETN positions for calculating portfolio margin requirements.

129.    In addition to the declaration described above, Plaintiffs and the Class are now suffering, and will continue to suffer, irreparable injury from IB's acts, in the form of exposure to excessive risk in portfolio margin trading.

130.    Plaintiffs and the Class have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein.  As such, Plaintiffs seek injunctive relief on behalf of themselves and members of the Class to bar IB from continuing to calculate portfolio margin requirements in a manner inconsistent with FINRA Rule 4210.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that the Court grant Plaintiffs and all Class members the following relief against the Defendant:

A.    For all recoverable compensatory and other damages sustained by Plaintiffs and the Class, to the extent not adjudicated in separate proceedings;

B.      For the disgorgement of all profits stemming from fees and commissions collected by IB associated with margin loans and trades in Portfolio Margin Accounts where ETN positions were subjected to portfolio margin treatment;

C.      A declaratory judgment that IB violated the terms of the Customer Agreement;

D.      An injunction preventing IB from calculating portfolio margin requirements using ETN positions, going forward;

E.      An award of attorneys' fees and costs to counsel for Plaintiffs and the Class;

F.      An order certifying this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23, establishing an appropriate Class or Classes and any Subclasses the Court deems appropriate, finding that Plaintiffs are proper representatives of the Class, and appointing the lawyers and law firms representing Plaintiffs as counsel for the Class;

G.      Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all counts so triable.

Dated: December 1, 2017

**KAPLAN FOX & KILSHEIMER LLP**

By: _ /s/ Frederic S. Fox_ _____
　　　　　Frederic S. Fox

Frederic S. Fox
Email: ffox@kaplanfox.com
Donald R. Hall, Jr.
Email: dhall@kaplanfox.com
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone:  (212) 687-1980
Facsimile:  (212) 687-7714

**MEYER WILSON CO., LPA**
David Meyer
Email: dmeyer@meyerwilson.com
Matthew R. Wilson
Email:  mwilson@meyerwilson.com
Michael J. Boyle, Jr.
Email:  mboyle@meyerwilson.com
1320 Dublin Road, Ste. 100
Columbus, Ohio 43215
Telephone:  (614) 224-6000
Facsimile:  (614) 224-6066
(*pro hac vices* to be filed)

**SHEPHERD, SMITH, EDWARDS & KANTAS, LLP**
Samuel B. Edwards
Email: sedwards@sseklaw.com
David W. Miller
Email: dmiller@sseklaw.com
1010 Lamar, Suite 900
Houston, TX  77002
Telephone: (713) 227-2400
Facsimile: (713) 227-7215
(*pro hac vices* to be filed)

**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King
Email: lking@kaplanfox.com
Matthew B. George
Email: mgeorge@kaplanfox.com
350 Sansome St., Suite 400
San Francisco, CA 94104
Telephone: (415) 772-4700
Facsimile: (415) 772-4707
(*pro hac vice* to be filed)

*Attorneys for Plaintiffs and the Proposed Class*

# Exhibit 1

## Interactive Brokers LLC Customer Agreement

**1. Customer Agreement:** This Agreement ("Agreement") governs the relationship between Customer and Interactive Brokers LLC ("IB"). If this Agreement varies from the IB website, this Agreement controls. This Agreement cannot be amended or waived except in writing by an IB officer. Customer Service employees cannot amend or waive any part of this Agreement. Customer acknowledges that IB may revise this Agreement by sending notice of the revised Agreement by e-mail or upon Customer log-in. Customer's use of IB after such notice constitutes acceptance of the revised Agreement.

**2. No Investment, Tax or Trading Advice:** IB representatives are not authorized to provide investment, tax or trading advice or to solicit orders. Nothing on IB's website is a recommendation or solicitation to buy or sell securities, futures or other investments.

**3. Responsibility for Customer Orders/Trades: Customer acknowledges that IB does not know whether someone entering orders with Customer's user name/password is Customer. Unless IB is notified and agrees, Customer will not allow anyone to access Customer's account. Customer is responsible for the confidentiality and use of Customer's user name/password and agrees to report any theft/loss of such user name/password, or any unauthorized access to Customer's account, immediately by telephone or electronically through the IB website. Customer remains responsible for all transactions entered using Customer's user name/password.**

**4. Order Routing:** Unless otherwise directed, IB will select the market/dealer to which to route Customer's orders. For products traded at multiple markets, IB may provide "Smart Routing", which seeks the best market for each order through a computerized algorithm. Customer should choose Smart Routing if available. If Customer directs orders to a particular market, Customer assumes responsibility for knowing and trading in accordance with the rules and policies of that market (e.g., trading hours, order types, etc.). IB cannot guarantee execution of every order at the best posted price: IB may not have access to every market/dealer; other orders may trade ahead; market centers may not honor posted prices or may re-route orders for manual handling; or market rules, decisions or system failures may prevent/delay execution of Customer's orders or cause orders not to receive the best price.

**5. Order Cancellation/Modification:** Customer acknowledges that it may not be possible to cancel/modify an order and that Customer is responsible for executions notwithstanding a cancel/modify request.

**6. Order Execution:** IB shall execute Customer orders as agent, unless otherwise confirmed. IB can execute Customer orders as principal. IB may use another broker, or an affiliate, to execute orders, and they have benefit of all IB's rights hereunder. IB may decline any Customer order, or terminate Customer's use of IB's services at any time in IB's discretion. All transactions are subject to rules and policies of relevant markets and clearinghouses, and applicable laws and regulations. **IB IS NOT LIABLE FOR ANY ACTION OR DECISION OF ANY EXCHANGE, MARKET, DEALER, CLEARINGHOUSE OR REGULATOR.**

**7. Confirmations:**

    **A. Customer agrees to monitor each order until IB confirms execution or cancellation. Customer acknowledges that confirmations of executions or cancellations may be delayed or may be erroneous (e.g. due to computer system issues) or may be cancelled/adjusted by an exchange. Customer is bound by the actual order execution, if consistent with Customer's order. If IB confirms execution or cancellation in error and Customer delays reporting such error, IB reserves the right to remove the trade from the account or require Customer to accept the**

trade, in IB's discretion.

**B. Customer agrees to notify IB immediately by telephone or electronically through the IB website if: i) Customer fails to receive an accurate confirmation of an execution or cancellation; ii) Customer receives a confirmation that is different than Customer's order; iii) Customer receives a confirmation for an order that Customer did not place; or iv) Customer receives an account statement, confirmation or other information reflecting inaccurate orders, trades, balances, positions, margin status or transaction history. Customer acknowledges that IB may adjust Customer's account to correct any error. Customer agrees to promptly return to IB any assets erroneously distributed to Customer.**

**8. <u>Proprietary Trading - Display of Customer Orders</u>: Subject to all laws and regulations, Customer authorizes IB to execute proprietary trades of itself and its affiliates, though IB may simultaneously hold unexecuted Customer orders for the same products at the same price.**

**9. <u>Customer Qualification</u>:** Customer warrants that his, her or its application is true and complete; will promptly notify IB of any information changes; and authorizes IB to make any inquiry to verify information.

A. <u>Natural Persons</u>: Customer warrants that Customer is over 18; is under no legal incapacity; and has sufficient knowledge and experience to understand the nature and risks of the products to be traded.

B. <u>Organizations</u>: Customer and its authorized representatives warrant that Customer: (i) is authorized under its governing document(s) and in the jurisdictions in which it is organized and/or regulated to enter this Agreement and trade (including on margin if applicable); (ii) is under no legal incapacity; and (iii) that persons identified to enter orders have proper authority and have sufficient knowledge and experience to understand the nature and risks of the products to be traded.

C. <u>Trusts</u>: "Customer" refers to the Trust and/or Trustees. Trustee(s) represent(s) that there are no Trustees other than listed in the application and certifies(y) that IB may follow instructions from any Trustee and deliver funds, securities, or any other assets to any Trustee or on any Trustee's instructions, including delivering assets to a Trustee personally. IB, in its discretion, may require written consent of any or all Trustee(s) prior to following instructions of any Trustee. Trustee(s) certify that Trustee(s) has (have) the power under the Trust documents and applicable law to enter this Agreement, open the type of account applied for, and enter transactions and issue instructions. Such powers include, without limit, authority to buy, sell (including short), exchange, convert, tender, redeem and withdraw assets (including delivery of securities to/from the account) to trade securities on margin or otherwise (including purchase/sale of options), and trade futures and/or options on futures, for the Trust. Should only one Trustee execute this Agreement, Trustee represents that Trustee has the authority to execute this Agreement, without consent by the other Trustees. Trustee(s) certifies(y) that all transactions for this account will comply with the Trust documents and applicable law and that all trading in this Account will be consistent with the powers delegated to the Trustee(s) by the Trust document(s) and with the fiduciary duties of the Trustee(s) to the Trust and/or the beneficiary(ies) of the Trust. Trustee(s) also certifies(y) that Trustee(s) will inform any beneficiary(ies) of the Trust of the activity in the Trust's account(s) as required by the Trust document and applicable law. Trustee(s), jointly and severally, shall indemnify IB and hold IB harmless from any claim, loss, expense or liability for effecting any transactions, and acting upon any instructions given by the Trustee(s). Trustee(s) will notify Interactive promptly if the authority of the Trustee(s) change in any manner material to this Agreement, including but not limited to any change affecting the accuracy of any warrants made herein.

D. <u>Regulated Persons and Entities</u>: Unless Customer notifies IB otherwise, Customer represents that Customer is not a broker-dealer; futures commission merchant; or affiliate, associated person or employee thereof. Customer agrees to notify IB immediately by telephone or electronically through the IB website if Customer becomes employed or associated with a broker-dealer or futures commission merchant.

**10. Joint Accounts:** Each joint account holder agrees that each joint holder has authority, without notice to the other, to: (i) buy/sell securities, futures or other products (including on margin); (ii) receive account confirmations and correspondence; (iii) receive and dispose of money, securities or other assets; (iv) enter, terminate, or agree to modify this Agreement; (v) waive any part of this Agreement; and (vi) deal with IB as if each joint holder was the sole holder. Notice to any joint holder constitutes notice to all joint holders. Each joint account holder is jointly and severally liable to IB for all account matters. IB may follow instructions of any joint holder and make delivery to any joint account holder individually of any account property.

Upon death of any joint holder, the surviving holder shall give IB notice by telephone or electronically through the IB website and IB may, before or after notice, initiate proceedings, require documents, retain assets and/or restrict transactions as it deems advisable to protect itself against any liability or loss. The estate of any deceased joint account holder shall be liable and each survivor will be liable, jointly and severally, to IB for any debt or loss in the account or upon liquidation of the account. Unless Customers indicate otherwise, IB may presume that account holders are joint tenants with rights of survivorship. Upon death of any joint holder, the account shall be vested in the surviving holders, without in any manner releasing the deceased joint holder's estate from liability.

**11. Margin:**

   **A. Risk of Margin Trading: Margin trading is highly risky and may result in a loss of funds greater than Customer has deposited in the account. Customer represents that he or she has read the "Disclosure of Risks of Margin Trading" provided separately by IB.**

   **B. Requirement to Maintain Sufficient Margin Continuously:** Margin transactions are subject to initial and maintenance margin requirements of exchanges, clearinghouses and regulators and also to any additional margin requirement of IB, which may be greater ("Margin Requirements"). **IB MAY MODIFY MARGIN REQUIREMENTS FOR ANY OR ALL CUSTOMERS FOR ANY OPEN OR NEW POSITIONS AT ANY TIME, IN IB'S SOLE DISCRETION.** Customer shall monitor his, her or its account so that at all times the account contains sufficient equity to meet Margin Requirements. IB may reject any order if the account has insufficient equity to meet Margin Requirements, and may delay processing any order while determining margin status. Customer shall maintain, without notice or demand, sufficient equity at all times to continuously meet Margin Requirements. Formulas for calculating Margin Requirements on the IB website are indicative only and may not reflect actual Margin Requirements. Customer must at all times satisfy whatever Margin Requirement is calculated by IB.

   **C. IB Will Not Issue Margin Calls: IB does not have to notify Customer of any failure to meet Margin Requirements prior to IB exercising its rights under this Agreement. Customer acknowledges that IB generally will not issue margin calls; generally will not credit Customer's account to meet intraday or overnight margin deficiencies; and is authorized to liquidate account positions in order to satisfy Margin Requirements without prior notice.**

   **D. Liquidation of Positions and Offsetting Transactions:**

      **i. IF AT ANY TIME CUSTOMER'S ACCOUNT HAS INSUFFICIENT EQUITY TO MEET MARGIN REQUIREMENTS OR IS IN DEFICIT, IB HAS THE RIGHT, IN ITS SOLE DISCRETION, BUT NOT THE OBLIGATION, TO LIQUIDATE ALL OR ANY PART OF CUSTOMER'S POSITIONS IN ANY OF CUSTOMER'S IB NON-IRA ACCOUNTS, INDIVIDUAL OR JOINT, AT ANY TIME AND IN ANY MANNER AND THROUGH ANY MARKET OR DEALER, WITHOUT PRIOR NOTICE OR MARGIN CALL TO CUSTOMER. CUSTOMER SHALL BE LIABLE AND WILL PROMPTLY PAY IB FOR ANY DEFICIENCIES IN CUSTOMER'S ACCOUNT THAT ARISE FROM SUCH LIQUIDATION OR REMAIN AFTER SUCH LIQUIDATION. IB HAS NO LIABILITY FOR ANY LOSS SUSTAINED BY CUSTOMER IN CONNECTION WITH SUCH LIQUIDATIONS (OR IF THE IB SYSTEM DELAYS EFFECTING, OR DOES**

**NOT EFFECT, SUCH LIQUIDATIONS) EVEN IF CUSTOMER RE-ESTABLISHES ITS POSITION AT A WORSE PRICE.**

ii. IB may allow Customer to pre-request the order of liquidation in event of a margin deficiency, but such requests are not binding on IB and IB retains sole discretion to determine the assets to be liquidated and the order/manner of liquidation. IB may liquidate through any market or dealer, and IB or its affiliates may take the other side of the transactions consistent with laws and regulations. If IB liquidates any/all positions in Customer's account, such liquidation shall establish Customer's gain/loss and remaining indebtedness to IB, if any. Customer shall reimburse and hold IB harmless for all actions, omissions, costs, fees (including, but not limited to, attorney's fees), or liabilities associated with any such transaction undertaken by IB. If IB executes an order for which Customer did not have sufficient equity, IB has the right, without notice, to liquidate the trade and Customer shall be responsible for any resulting loss and shall not be entitled to any resulting profit.

iii. If IB does not, for any reason, liquidate under-margined positions, and issues a margin call, Customer must satisfy such call immediately by depositing funds. Customer acknowledges that even if a call is issued, IB still may liquidate positions at any time.

iv. Customer acknowledges that IB also has the right to liquidate all or part of Customer's positions without prior notice: (i) if any dispute arises concerning any Customer trade, (ii) upon any "Default" as described in 16 below, or (iii) whenever IB deems liquidation necessary or advisable for IB's protection.

**12. <u>Universal Accounts:</u>** An IB Universal Account is two underlying accounts: an SEC-regulated securities account and a CFTC-regulated commodity account. Customer authorizes transfers between the securities and commodity accounts to cover Margin Requirements and other obligations, and acknowledges IB may liquidate positions to cover obligations in the other account. Customer authorizes IB to provide combined confirmations/statements for both accounts. **Customer acknowledges that only assets in the securities account are covered by SIPC protection and excess coverage and <u>not</u> assets in the commodity account.**

**13. <u>Short Sales:</u>** Customer acknowledges that short sales must be done in a margin account, subject to Margin Requirements; that prior to selling short, IB must believe it can borrow stock for delivery; and that if IB cannot borrow stock (or re-borrow after a recall notice) IB may buy-in stock on Customer's behalf, without notice to Customer, to cover short positions and Customer is liable for any losses/costs.

**14. <u>IB's Right to Loan/Pledge Customer Assets:</u>** As allowed by law, IB is authorized by Customer to lend to itself or others Customer securities or assets. IB may, without notice, pledge, re-pledge, hypothecate or re-hypothecate Customer's securities and assets, separately or together with those of other customers, for any amount due in any IB account in which Customer has an interest, without retaining in IB's possession or control a like amount of assets. For loans of securities, IB may receive financial and other benefits to which Customer is not entitled. Such loans could limit Customer's ability to exercise securities' voting rights.

**15. <u>Security Interest:</u>** All assets of any kind held by or on behalf of IB for Customer's account are hereby pledged to IB and are subject to a perfected first priority lien and security interest in IB's favor to secure performance of obligations and liabilities to IB arising under this or any other Agreement.

**16. <u>Event of Default:</u>** A "Default" occurs automatically, without notice upon: (i) Customer breach/repudiation of any agreement with IB; (ii) Customer failure to provide assurance satisfactory to IB of performance of an obligation, after request from IB in IB's sole discretion; (iii) proceedings by/against Customer under any bankruptcy, insolvency, or similar law; (iv) assignment for the benefit of Customer's creditors; (v) appointment of a receiver, trustee, liquidator or similar officer for Customer or Customer property; (vi) Customer representations being untrue or misleading when made or later becoming untrue; (vii) legal incompetence of Customer; (viii)

proceeding to suspend Customer's business or license by any regulator or organization; (ix) IB having reason to believe that any of the foregoing is likely to occur imminently.

Customer unconditionally agrees that, upon a Default, IB may terminate any or all IB's obligations to Customer and IB shall have the right in its discretion, but not the obligation, without prior notice, to liquidate all or any part of Customer's positions in any IB account, individual or joint, at any time and any manner and through any market or dealer. Customer shall reimburse and hold IB harmless for all actions, omissions, costs, fees (including, but not limited to, attorney's fees), or liabilities associated with any Customer Default or any transaction undertaken by IB upon Default.

**17. Suspicious Activity:** If IB in its sole discretion believes that a Customer account has been involved in any fraud or crime or violation of laws or regulations, or has been accessed unlawfully, or is otherwise involved in any suspicious activity (whether victim or perpetrator or otherwise), IB may suspend or freeze the account or any privileges of the account, may freeze or liquidate funds or assets, or may utilize any of the remedies in this Agreement for a "Default".

**18. Multi-Currency Function in IB Accounts:**

A. Customers may be able to trade products denominated in different currencies using a base currency chosen by Customer. Upon purchase of a product denominated in a different currency from the base currency, a margin loan is created to fund the purchase, secured by the assets in Customer's accounts. If Customer maintains positions denominated in foreign currencies, IB will calculate Margin Requirements by applying exchange rates specified by IB. **IB WILL APPLY "HAIRCUTS" (A PERCENTAGE DISCOUNT ON THE FOREIGN CURRENCY EQUITY AMOUNT) TO REFLECT THE POSSIBILITY OF FLUCTUATING EXCHANGE RATES BETWEEN THE BASE CURRENCY AND THE FOREIGN CURRENCY. CUSTOMER MUST CLOSELY MONITOR MARGIN REQUIREMENTS AT ALL TIMES, PARTICULARLY FOR POSITIONS DENOMINATED IN FOREIGN CURRENCIES, BECAUSE FLUCTUATION IN THE CURRENCY *AND* THE VALUE OF THE UNDERLYING POSITION CAN CAUSE A MARGIN DEFICIT.**

B. Customer agrees that IB's obligations to Customer shall be denominated in: (i) the United States dollar; (ii) a currency in which funds were deposited by Customer or were converted at the request of Customer, to the extent of such deposits and conversions; or (iii) a currency in which funds have accrued to the customer as a result of trading conducted on a designated contract market or registered derivatives transaction execution facility, to the extent of such accruals. Information regarding Customer's currency conversions is provided on the IB customer statements. Customer further agrees that IB may hold customer funds in: (i) the United States; (ii) a money center country as defined by the US Commodity Exchange Act & regulations thereunder; or (iii) the country of origin of the currency. In addition, Customer acknowledges and authorizes IB to hold Customer's funds outside the United States, in a jurisdiction that is neither a money center country nor the country of origin of the currency in order to facilitate Customer's trading in investments denominated in that currency.

**19. Foreign Currency Exchange ("Forex") Transactions:**

**A. HIGH RISKS OF FOREX TRADING: FOREX TRADING IS GENERALLY UNREGULATED, IS HIGHLY RISKY DUE TO THE LEVERAGE (MARGIN) INVOLVED, AND MAY RESULT IN LOSS OF FUNDS GREATER THAN CUSTOMER DEPOSITED IN THE ACCOUNT. Customer represents that he or she has read and acknowledges the "Risk Disclosure Statement for Forex Trading and Multi-Currency Accounts" provided separately by IB.**

B. For Forex transactions, IB generally will act as agent or riskless principal and charge a fee. IB may effect Forex transactions through an affiliate or third party, which may profit or lose from such transactions. Customer agrees that IB may transfer to or from Customer's regulated futures or

securities account(s) from or to any of Customer's non-regulated Forex account any funds or assets that may be required to avoid margin calls, reduce debit balances or for any other lawful reason.

C. <u>Netting</u>: (i) <u>Netting by Novation</u>. Each Forex transaction between Customer and IB will immediately be netted with all then-existing Forex transactions between Customer and IB for the same currencies to constitute one transaction. (ii) <u>Payment Netting</u>. If on any delivery date more than one delivery of a currency is due, each party shall aggregate the amounts deliverable and only the difference shall be delivered. (iii) <u>Close-Out Netting</u>. If Customer: (a) incurs a margin deficit in any IB account, (b) defaults on any obligation to IB, (c) becomes subject to bankruptcy, insolvency or other similar proceedings, or (d) fails to pay debts when due, IB has the right but not the obligation to close out Customer's Forex transactions, liquidate all or some of Customer's collateral and apply the proceeds to any debt to IB. (iv) Upon Close-Out Netting or any "Default", all outstanding Forex transactions will be deemed terminated as of the time immediately preceding the triggering event, petition or proceeding. (v) IB's rights herein are in addition to any other rights IB has (whether by agreement, by law or otherwise).

D. Nothing herein constitutes a commitment of IB to offer Forex transactions generally or to enter into any specific Forex transaction. IB reserves the unlimited right to refuse any Forex order or to decline to quote a two-way market in any currency.

**20. <u>Commodity Options and Futures Not Settled in Cash</u>:** Customer acknowledges that: (A) commodity options cannot be exercised and must be closed out by offset; and (B) for futures contracts that settle not in cash but by physical delivery of the commodity (including currencies not on IB's Deliverable Currency List), Customer cannot make or receive delivery. If Customer has not offset a commodity option or physical delivery futures position prior to the deadline on the IB website, IB is authorized to roll or liquidate the position or liquidate any position or commodity resulting from the option or futures contract, and Customer is liable for all losses/costs.

**21. <u>Commissions and Fees, Interest Charges, Funds</u>:** Commissions and fees are as specified on the IB website unless otherwise agreed in writing by an officer of IB. Customer acknowledges that IB deducts commissions/fees from Customer accounts, which will reduce account equity. Positions will be liquidated if commissions or other charges cause a margin deficiency. Changes to commissions/fees are effective immediately upon either of: posting on the IB website or email or other written notice to Customer. IB shall pay credit interest to and charge debit interest from Customer at interest rates and terms on the IB website. Customer funds will not be disbursed until after transactions are settled. Terms and conditions for deposit and withdrawal of funds (including holding periods) are as specified on the IB website.

**22. <u>Account Deficits</u>:** If a cash account incurs a deficit, margin interest rates will apply until the balance is repaid, and IB has the right, but not the obligation, to treat the account as a margin account. **Customer agrees to pay reasonable costs of collection for any unpaid Customer deficit, including attorneys' and collection agent fees.**

**23. <u>Risks of Foreign Markets; After Hours Trading</u>: Customer acknowledges that trading securities, options, futures, currencies or any product on a foreign market is speculative and involves high risk. There also are special risks of trading outside ordinary market hours, including risk of lower liquidity, higher volatility, changing prices, un-linked markets, news announcements affecting prices and wider spreads. Customer represents that Customer is knowledgeable and able to assume these risks.**

**24. <u>Knowledge of Securities, Warrants and Options; Corporate Actions</u>:** Customer acknowledges Customer's responsibility for knowing the terms of any securities, options, warrants or other products in Customer's account, including upcoming corporate actions (e.g., tender offers, reorganizations, stock splits, etc.). IB has no obligation to notify Customer of deadlines or required actions or dates of meetings, nor is IB obligated to take any action without specific written instructions sent by Customer to IB electronically through the IB website.

**25. <u>Quotes, Market Information, Research and Internet Links</u>:** Quotes, news, research and information accessible through IB (including through links to outside websites) ("Information") may be prepared by

independent Providers. The Information is the property of IB, the Providers or their licensors and is protected by law. Customer agrees not to reproduce, distribute, sell or commercially exploit the Information in any manner without written consent of IB or the Providers. IB reserves the right to terminate access to the Information. None of the Information constitutes a recommendation by IB or a solicitation to buy or sell. Neither IB nor the Providers guarantee accuracy, timeliness, or completeness of the Information, and Customer should consult an advisor before making investment decisions. **RELIANCE ON QUOTES, DATA OR OTHER INFORMATION IS AT CUSTOMER'S OWN RISK. IN NO EVENT WILL IB OR THE PROVIDERS BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, SPECIAL OR INDIRECT DAMAGES ARISING FROM USE OF THE INFORMATION. THERE IS NO WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, REGARDING THE INFORMATION, INCLUDING WARRANTY OF MERCHANTIBILITY, WARRANTY OF FITNESS FOR A PARTICULAR USE OR WARRANTY OF NON-INFRINGEMENT.**

26. <u>License to Use IB Software:</u> IB grants Customer a non-exclusive, non-transferable license to use IB Software solely as provided herein. Title to IB Software and updates shall remain the sole property of IB, including all patents, copyrights and trademarks. Customer shall not sell, exchange or transfer the IB Software to others. Customer shall not copy, modify, translate, decompile, reverse engineer, disassemble or reduce to a human readable form, or adapt, the IB Software or use it to create a derivative work, unless authorized in writing by an officer of IB. IB is entitled to immediate injunctive relief for threatened breaches of these undertakings.

27. <u>LIMITATION OF LIABILITY AND LIQUIDATED DAMAGES PROVISION:</u> **CUSTOMER ACCEPTS THE IB SYSTEM "AS IS", AND WITHOUT WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE, PURPOSE OR APPLICATION; TIMELINESS; FREEDOM FROM INTERRUPTION; OR ANY IMPLIED WARRANTIES ARISING FROM TRADE USAGE, COURSE OF DEALING OR COURSE OF PERFORMANCE. UNDER NO CIRCUMSTANCES SHALL IB BE LIABLE FOR ANY PUNITIVE, INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL LOSS OR DAMAGES, INCLUDING LOSS OF BUSINESS, PROFITS OR GOODWILL. IB SHALL NOT BE LIABLE TO CUSTOMER BY REASON OF DELAYS OR INTERRUPTIONS OF SERVICE OR TRANSMISSIONS, OR FAILURES OF PERFORMANCE OF THE IB SYSTEM, REGARDLESS OF CAUSE, INCLUDING, BUT NOT LIMITED TO, THOSE CAUSED BY HARDWARE OR SOFTWARE MALFUNCTION; GOVERNMENTAL, EXCHANGE OR OTHER REGULATORY ACTION; ACTS OF GOD; WAR, TERRORISM, OR IB'S INTENTIONAL ACTS. CUSTOMER RECOGNIZES THAT THERE MAY BE DELAYS OR INTERRUPTIONS IN THE USE OF THE IB SYSTEM, INCLUDING, FOR EXAMPLE, THOSE CAUSED INTENTIONALLY BY IB FOR PURPOSES OF SERVICING THE IB SYSTEM.** <u>**IN NO EVENT SHALL IB'S LIABILITY, REGARDLESS OF THE FORM OF ACTION AND DAMAGES SUFFERED BY CUSTOMER, EXCEED THE HIGHEST TOTAL MONTHLY COMMISSIONS PAID BY CUSTOMER TO IB OVER THE 6 MONTHS PRIOR TO ANY INCIDENT.**</u>

28. <u>Customer Must Maintain Alternative Trading Arrangements:</u> Computer-based systems such as those used by IB are inherently vulnerable to disruption, delay or failure. **CUSTOMER MUST MAINTAIN ALTERNATIVE TRADING ARRANGEMENTS IN ADDITION TO CUSTOMER'S IB ACCOUNT FOR EXECUTION OF CUSTOMER'S ORDERS IN THE EVENT THAT THE IB SYSTEM IS UNAVAILABLE. By signing this Agreement, Customer represents that Customer maintains alternative trading arrangements.**

29. <u>IB and Its Affiliates:</u> A copy of IB's audited financial statements shall be posted on the IB website and, upon request, mailed to Customer. Customers shall rely only on the financial condition of IB, and not on its affiliates, which are not liable for IB's acts and omissions.

30. <u>**DISCLOSURE STATEMENT:**</u> **THIS STATEMENT IS FURNISHED TO YOU BECAUSE RULE 190.10(c) OF THE COMMODITY FUTURES TRADING COMMISSION REQUIRES IT FOR REASONS OF FAIR NOTICE UNRELATED TO IB'S CURRENT FINANCIAL CONDITION: (A) YOU SHOULD KNOW THAT IN THE UNLIKELY EVENT OF THIS COMPANY'S BANKRUPTCY, PROPERTY, INCLUDING PROPERTY SPECIFICALLY TRACEABLE TO YOU, WILL BE RETURNED, TRANSFERRED OR DISTRIBUTED TO YOU, OR ON YOUR BEHALF, ONLY TO THE EXTENT OF**

**YOUR PRO RATA SHARE OF ALL PROPERTY AVAILABLE FOR DISTRIBUTION TO CUSTOMERS; (B) NOTICE CONCERNING THE TERMS FOR THE RETURN OF SPECIFICALLY IDENTIFIABLE PROPERTY WILL BE MADE BY PUBLICATION IN A NEWSPAPER OF GENERAL CIRCULATION; (C) THE COMMISSION'S REGULATIONS CONCERNING BANKRUPTCIES OF COMMODITY BROKERS CAN BE FOUND AT TITLE 17 OF THE CODE OF FEDERAL REGULATIONS PART 190.**

**31. <u>Consent To Accept Electronic Records And Communications</u>**

IB provides electronic trade confirmations, account statements, tax information and other Customer records and communications (collectively, "Records and Communications") in electronic form. Electronic Records and Communications may be sent to Customer's Trader Workstation ("TWS") or to Customer's e-mail address, or for security purposes may be posted on the IB website and customer will need to log in and retrieve the Communication. By entering into this Agreement, Customer consents to the receipt of electronic Records and Communications. Such consent will apply on an ongoing basis and for every tax year unless withdrawn by Customer. Customer may withdraw such consent at any time by providing electronic notice to IB through the IB website. If Customer withdraws such consent, IB will provide required tax documents in paper form upon request by telephone or via the IB website. However, IB reserves the right to require Customer to close Customer's account.

In order to trade using the IB TWS, and to receive Records and Communications through the TWS, there are certain system hardware and software requirements, which are described on the IB website at www.interactivebrokers.com. Since these requirements may change, Customer must periodically refer to the IB website for current system requirements. To receive electronic mail from IB, Customer is responsible for maintaining a valid Internet e-mail address and software allowing customer to read, send and receive e-mail. Customer must notify IB immediately of a change in Customer's e-mail address by using those procedures to change a Customer e-mail address that may be available on the IB website.

**32. <u>Miscellaneous:</u>**

A. This Agreement is governed by the laws of the State of New York, without giving effect to conflict of laws provisions. Courts of New York have exclusive jurisdiction over disputes relating to this Agreement, except when arbitration is provided. **IN ALL JUDICIAL ACTIONS, ARBITRATIONS OR DISPUTE RESOLUTION METHODS, THE PARTIES WAIVE ANY RIGHT TO PUNITIVE DAMAGES.**

B. Customer agrees to the provision of this Agreement in English and represents that Customer understands its terms and conditions. This Agreement contains the entire agreement between the parties, who have made no other representations or warranties. If any provision of this Agreement is unenforceable, it shall not invalidate other provisions. Failure of IB to enforce any term or condition of this Agreement is not a waiver of the term/condition.

C. Customer consents to recording of all telephone conversations. Customer acknowledges the IBG Privacy Statement and consents to collection/use of Customer information as described therein.

D. Customer may not assign or transfer any rights or obligations hereunder without the prior written consent of IB. Upon notice to Customer IB may assign this Agreement to another broker-dealer or futures commission merchant. This Agreement shall inure to the benefit of IB's successors and assigns. IB may terminate this Agreement or its services to Customer at any time. Customer may close its account upon notice to IB electronically through the IB website, but only after all positions are closed and all other requirements specified on the IB website regarding account closure are satisfied.

E. Customer authorizes IB, directly or through third parties, to make any inquiries that IB considers necessary to conduct business with Customer. This may include ordering a credit report and performing other credit checks in the event of any default or breach of the obligations herein by Customer, or verifying the information Customer provides against third party databases. Any

information obtained is maintained in accordance with the Interactive Brokers Group Privacy Statement.

**33. Mandatory Arbitration:**

**A. This agreement contains a pre-dispute arbitration clause. By signing an arbitration agreement the parties agree as follows:**

- **ALL PARTIES TO THIS AGREEMENT ARE GIVING UP THE RIGHT TO SUE EACH OTHER IN COURT, INCLUDING THE RIGHT TO A TRIAL BY JURY, EXCEPT AS PROVIDED BY THE RULES OF THE ARBITRATION FORUM IN WHICH A CLAIM IS FILED.**

- **ARBITRATION AWARDS ARE GENERALLY FINAL AND BINDING; A PARTY'S ABILITY TO HAVE A COURT REVERSE OR MODIFY AN ARBITRATION AWARD IS VERY LIMITED.**

- **THE ABILITY OF THE PARTIES TO OBTAIN DOCUMENTS, WITNESS STATEMENTS AND OTHER DISCOVERY IS GENERALLY MORE LIMITED IN ARBITRATION THAN IN COURT PROCEEDINGS.**

- **THE ARBITRATORS DO NOT HAVE TO EXPLAIN THE REASON(S) FOR THEIR AWARD. UNLESS, IN AN ELIGIBLE CASE, A JOINT REQUEST FOR AN EXPLAINED DECISION HAS BEEN SUBMITTED BY ALL PARTIES TO THE PANEL AT LEAST 20 DAYS PRIOR TO THE FIRST SCHEDULED HEARING DATE.**

- **THE PANEL OF ARBITRATORS WILL TYPICALLY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR ARE AFFILIATED WITH THE SECURITIES INDUSTRY.**

- **THE RULES OF SOME ARBITRATION FORUMS MAY IMPOSE TIME LIMITS FOR BRINGING A CLAIM IN ARBITRATION.**

- **IN SOME CASES, A CLAIM THAT IS INELIGIBLE FOR ARBITRATION MAY BE BROUGHT IN COURT.**

- **THE RULES OF THE ARBITRATION FORUM IN WHICH THE CLAIM IS FILED, AND ANY AMENDMENTS THERETO, SHALL BE INCORPORATED INTO THIS AGREEMENT.**

**B. Customer agrees that any controversy, dispute, claim, or grievance between IB, any IB affiliate or any of their shareholders, officers, directors employees, associates, or agents, on the one hand, and Customer or, if applicable, Customer's shareholders, officers, directors employees, associates, or agents on the other hand, arising out of, or relating to, this Agreement, or any account(s) established hereunder in which securities may be traded; any transactions therein; any transactions between IB and Customer; any provision of the Customer Agreement or any other agreement between IB and Customer; or any breach of such transactions or agreements, shall be resolved by arbitration, in accordance with the rules then prevailing of any one of the following: (a) The Financial Industry Regulatory Authority; or (b) any other exchange of which IB is a member, as the true claimant-in-interest may elect. If Customer is the claimant-in-interest and has not selected an arbitration forum within ten days of providing notice of Customer's intent to arbitrate, IB shall select the forum. The award of the arbitrators, or a majority of them, shall be final, and judgment upon the award rendered may be entered in any court, state or federal, having jurisdiction.**

**C. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until:**

- **the class certification is denied; or**
- **the class is decertified; or**
- **the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this Agreement except to the extent stated herein.**

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE IN PARAGRAPH 33. BY SIGNING THIS AGREEMENT I ACKNOWLEDGE THAT THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AND THAT I HAVE RECEIVED, READ AND UNDERSTOOD THE TERMS THEREOF.

CUSTOMER REPRESENTS THAT THE FOREGOING INFORMATION AND ALL OTHER INFORMATION PROVIDED DURING THE ACCOUNT APPLICATION PROCESS IS TRUE AND CORRECT AND AGREES TO NOTIFY IBLLC-US BY EMAIL OF ANY MATERIAL CHANGES THEREIN. CUSTOMER AUTHORIZES IBLLC-US TO CONFIRM THE ACCURACY OF THE INFORMATION AS IT DEEMS NECESSARY.

USER NAME: ▮▮▮▮▮▮
ACCOUNT TITLE: *Heather Hauptman*
Dated: 2015-06-19 14:39:51.0
Signature:                    Heather Hauptman                    Heather Hauptman
                                                                 TYPING NAME IS EQUIVALENT TO A
                                                                 HANDWRITTEN SIGNATURE

BY TYPING MY SIGNATURE AND SENDING IT VIA THE INTERNET, I ACKNOWLEDGE THAT I HAVE READ AND UNDERSTAND ALL INFORMATION PROVIDED DURING THE APPLICATION PROCESS; THAT I INTEND IBLLC-US TO RELY UPON IT; THAT I INTEND TO BE BOUND THEREBY; AND THAT I UNDERSTAND AND AGREE THAT MY ELECTRONIC SIGNATURE IS THE EQUIVALENT OF A MANUAL WRITTEN SIGNATURE.

# Exhibit 2

Portfolio Margin Risk Disclosure Statement

## OVERVIEW OF PORTFOLIO MARGINING

1. Portfolio margining is a margin methodology that sets margin requirements for an account using a "risk-based" pricing model that calculates the largest potential loss of all positions in a product class or group across a range of underlying prices and volatilities. This model, known as the Theoretical Intermarket Margining System ("TIMS"), is applied each night to U.S. stocks, OCC stock and index options, and U.S. single stock futures positions by the federally-chartered Options Clearing Corporation ("OCC") and is disseminated by the OCC to participating brokerage firms each night. Interactive Brokers evaluates margin compliance throughout the trading day based on the current positions in the account and current market prices, but the margin calculations are based on TIMS parameters received the prior evening.

2. The goal of portfolio margining is to set levels of margin that more precisely reflect actual net risk. The customer may benefit from portfolio margining in that margin requirements that are calculated based on net risk are generally lower than alternative "position" or "strategy" based methodologies for determining margin requirements. Lower margin requirements allow the customer more leverage in an account.

## CUSTOMERS ELIGIBLE FOR PORTFOLIO MARGINING

3. To be eligible for portfolio margining, customers (other than broker-dealers or members of a national futures exchange) must be approved for writing uncovered options. If a customer (other than a broker-dealer or member of a national futures exchange) wishes to trade in unlisted derivatives, the customer must have and maintain at all times account equity of not less than five million dollars, aggregated across all accounts under identical ownership at the carrying broker-dealer and/or its US-regulated affiliated broker-dealers or Futures Commission Merchants. This identical ownership requirement excludes accounts held by the same customer in different capacities (e.g., as a trustee and as an individual) and accounts where ownership is overlapping but not identical (e.g., individual accounts and joint accounts). In addition to the requirements of the self-regulatory organization rule, carrying broker-dealers may have their own minimum equity requirement and possibly other eligibility requirements.

## POSITIONS ELIGIBLE FOR A PORTFOLIO MARGIN ACCOUNT

4. All margin equity securities (as defined in Section 220.2 of Regulation T of the Board of Governors of the Federal Reserve System), warrants on margin equity securities or on eligible indices of equity securities, equity-based or equity-index based listed options, and security futures products (as defined in Section 3(a)(56) of the Securities Exchange Act of 1934) are eligible to be margined in a portfolio margin account. In addition, a customer that has an account with equity of at least five million dollars may establish and maintain positions in unlisted derivatives (e.g., OTC swaps, options) on a margin equity security or an eligible index of equity securities that can be priced by a theoretical pricing model approved by the Securities and Exchange Commission ("SEC").

## SPECIAL RULES FOR PORTFOLIO MARGIN ACCOUNTS

5. A portfolio margin account may be either a separate account or a sub-account of a customer's standard margin account. In the case of a sub-account, equity in the standard account may be available to satisfy any margin requirement in the portfolio margin sub-account without transfer to the sub-account.

6. A portfolio margin account or sub-account will be subject to a minimum margin requirement of $.375 for each listed option, unlisted derivative and security futures product, multiplied by the contract's or instrument's multiplier, carried long or short in the account. Other eligible products are not subject to a minimum margin

requirement.

7. A margin deficiency in the portfolio margin account or sub-account, regardless of whether due to new commitments or the effect of adverse market movements on existing positions, must be met within three business days. Failure to meet a portfolio margin deficiency by the end of the third business day will result in a prohibition on entering any new orders, with the exception of new orders that reduce the margin requirement. Failure to meet a portfolio margin deficiency by the end of the third business day will result in the prompt liquidation of positions on the fourth business day, to the extent necessary to eliminate the margin deficiency.

8. Any shortfall in aggregate equity across accounts, when required, must be met within three business days. Failure to meet a minimum equity deficiency by the end of the third business day will result in a prohibition on entering any new orders, with the exception of new orders that reduce the margin requirement, beginning on the fourth business day and continuing until such time as the minimum equity requirement is satisfied, or if applicable, all unlisted derivatives are liquidated or transferred out of the portfolio margin account.

**Please note that pursuant to the IB Customer Agreement, IB reserves the right to liquidate positions prior to the fourth business day. **

SPECIAL RISKS OF PORTFOLIO MARGIN ACCOUNTS

9. Portfolio margining generally permits greater leverage in an account, and greater leverage creates greater losses in the event of adverse market movements.

10. Because the maximum time limit for meeting a margin deficiency is shorter than in a standard margin account, there is increased risk that a customer's portfolio margin account will be liquidated involuntarily, possibly causing losses to the customer.

11. Because portfolio margin requirements are determined using sophisticated mathematical calculations and theoretical values that must be calculated from market data, it may be more difficult for customers to predict the size of future margin deficiencies in a portfolio margin account. This is particularly true in the case of customers who do not have access to specialized software necessary to make such calculations or who do not receive theoretical values calculated and distributed periodically by an approved vendor of theoretical values.

12. Trading of margin equity securities, warrants on margin equity securities or on eligible indices of equity securities, listed options, unlisted derivatives on margin equity securities or an eligible index of equity securities, and security futures products in a portfolio margin account is generally subject to all the risks of trading those same products in a standard securities margin account. Customers should be thoroughly familiar with the risk disclosure materials applicable to those products, including the booklets entitled "Characteristics and Risks of Standardized Options" and "Security Futures Risk Disclosure Statement". Because this disclosure statement does not disclose the risks and other significant aspects of trading in security futures and options, customers should review those materials carefully before trading these products in a portfolio margin account.

13. Customers should consult with their tax advisers to be certain that they are familiar with the tax treatment of transactions in margin equity securities, warrants on margin equity securities or on eligible indices of equity securities, listed options, unlisted derivatives on margin equity securities or an eligible index of equity securities, and security futures products, including tax consequences of trading strategies involving both security futures and option contracts.

14. The descriptions in this disclosure statement relating to eligibility requirements for portfolio margin accounts, and minimum equity and margin requirements for those accounts, are minimums imposed under the self-regulatory organization rules. Time frames within which margin and equity deficiencies must be met are maximums imposed under the self-regulatory organization rules. Broker-dealers may impose their own more stringent requirements.

15. Customers should bear in mind that the discrepancies in the cash flow characteristics of security futures and certain options are still present even when those products are carried together in a portfolio margin account. In

addition, discrepancies in the cash flow characteristics of certain unlisted derivatives may also be present when those products are carried in a portfolio margin account. Both security futures and options contracts are generally marked to the market at least once each business day. Similarly, certain unlisted derivatives may also be marked to the market on a daily basis. However, there may be incongruity between the marking to the market of each eligible product in that marks may take place with different frequency and at different times within the day. For example, when a security futures contract is marked to the market, the gain or loss is immediately credited to or debited from, respectively, the customer's account in cash. While a change in the value of a long option contract may increase or decrease the equity in the account, the gain or loss is not realized until the option is liquidated, exercised or assigned. Accordingly, a customer may be required to deposit cash in the account in order to meet a variation payment on a security futures contract even though the customer is in a hedged position and has experienced a corresponding (but yet unrealized) gain on an option. Alternatively, a customer who is in a hedged position and would otherwise be entitled to receive a variation payment on a security futures contract may find that the cash is required to be held in the account as margin collateral on an offsetting option position.

The general provisions governing portfolio margining (including definitions used in this document) are set forth in NYSE Rule 431(g) and FINRA Rule 4210(g), which can be found at http://nyserules.nyse.com/NYSE/Rules and www.finra.org .

ACKNOWLEDGEMENT FOR CUSTOMERS UTILIZING A PORTFOLIO MARGIN ACCOUNT

BY SIGNING BELOW, I/WE AFFIRM THAT I/WE HAVE READ AND UNDERSTOOD THE PORTFOLIO MARGINING RISK DISCLOSURE STATEMENT.

CUSTOMER NAME:
BY:                                                    DATE

CUSTOMER REPRESENTS THAT THE FOREGOING INFORMATION AND ALL OTHER INFORMATION PROVIDED DURING THE ACCOUNT APPLICATION PROCESS IS TRUE AND CORRECT AND AGREES TO NOTIFY IBLLC-US BY EMAIL OF ANY MATERIAL CHANGES THEREIN. CUSTOMER AUTHORIZES IBLLC-US TO CONFIRM THE ACCURACY OF THE INFORMATION AS IT DEEMS NECESSARY.

USER NAME: ▮▮▮▮▮▮
ACCOUNT TITLE: *Heather Hauptman*
Dated: 2015-06-19 14:38:52.0
Signature:                     Heather Hauptman                     Heather Hauptman
                                                                    TYPING NAME IS EQUIVALENT TO A
                                                                    HANDWRITTEN SIGNATURE

BY TYPING MY SIGNATURE AND SENDING IT VIA THE INTERNET, I ACKNOWLEDGE THAT I HAVE READ AND UNDERSTAND ALL INFORMATION PROVIDED DURING THE APPLICATION PROCESS; THAT I INTEND IBLLC-US TO RELY UPON IT; THAT I INTEND TO BE BOUND THEREBY; AND THAT I UNDERSTAND AND AGREE THAT MY ELECTRONIC SIGNATURE IS THE EQUIVALENT OF A MANUAL WRITTEN SIGNATURE.

Exhibit 3



Home

## Securities Ineligible for Portfolio Margining

Outlined in the table below are ETN products which will no longer be eligible for Portfolio Margining and will be subject to Reg. T margin during the week beginning May 19, 2014.

Note that the term "Class Group" refers to an aggregation of securities of a like issue and which are afforded full offset between their respective risk computations at a given scenario.  The term "Product Group" refers to an aggregation of one or more Class Groups which have historically exhibited sufficiently high positive correlation to allow partial offset between their respective risk computations.

Class and Product Group offsets are offered only under the Portfolio Margining methodology and once positions are subject to Reg. T methodology, these offsets will not be recognized and the margin requirement on positions previously offset will increase.

| Symbol | Description | Product Type | Class Group | Product Group |
|--------|-------------|--------------|-------------|---------------|
| DRR | Market Vectors Double Short Euro ETN | Stock & Option | 35 | 35 |
| URR | Market Vectors Double Long Euro ETN | Stock & Option | 35 | 35 |
| DLBL | iPath US Treasury Long Bond Bull ETN | Stock & Option | 345 | 145 |
| DLBS | iPath US Treasury Long Bond Bear ETN | Stock & Option | 345 | 145 |
| ADZ | PowerShares DB Agriculture Short ETN | Stock | 230 | 230 |
| AGA | PowerShares DB Agriculture Double Short ETN | Stock | 230 | 230 |
| DAG | PowerShares DB Agriculture Double Long ETN | Stock & Option | 230 | 230 |
| DTO | PowerShares DB Crude Oil Double Short ETN | Stock & Option | 202 | 234 |
| SZO | PowerShares DB Crude Oil Short ETN | Stock & Option | 202 | 234 |
| OIL | iPath Goldman Sachs Crude Oil Total Return Index ETN | Stock & Option | 204 | 234 |
| DGP | PowerShares DB Gold Double Long ETN | Stock & Option | 237 | 244 |
| DGZ | PowerShares DB Gold Short ETN | Stock & Option | 237 | 244 |
| DZZ | PowerShares DB Gold Double Short ETN | Stock & Option | 237 | 244 |
| AGF | POWERSHARES DB AGRICULT LNG | Stock | AGF | 999 |
| ALTL | RBS US L/C ALTERNATOR ETN | Stock | ALTL | 999 |
| AMJ | JPMorgan Alerian MLP Index ETN | Stock & Option | AMJ | 999 |
| AMU | ETRACS ALERIAN MLP ETN | Stock | AMU | 999 |
| AYT | IPATH GEMS ASIA 8 ETN | Stock | AYT | 999 |
| BAL | iPath Dow Jones-UBS Cotton Subindex Total Return Callable ETN | Stock & Option | BAL | 999 |
| BARL | MORGAN STANLEY S&P 500 CRUDE | Stock | BARL | 999 |
| BCM | IPATH PURE BETA BROAD CMDTY | Stock | BCM | 999 |
| BDCL | ETRACS 2X WELLS FARGO BDCI | Stock | BDCL | 999 |
| BDCS | E-TRACS WELLS FARGO BDCI ETN | Stock | BDCS | 999 |
| BDD | PowerShares DB Base Metals Double Long ETN | Stock & Option | BDD | 999 |
| BDG | POWERSHARES DB METALS LONG | Stock | BDG | 999 |
| BLNG | IPATH PURE BETA PREC METALS | Stock | BLNG | 999 |
| BOM | PowerShares DB Base Metals Double Short ETN | Stock & Option | BOM | 999 |
| BOS | PowerShares DB Base Metals Short ETN | Stock & Option | BOS | 999 |
| BUNL | POWERSHARES DB GERMN BND FUT | Stock | BUNL | 999 |
| BUNT | POWERSHARES DB 3X GRMAN BUND | Stock | BUNT | 999 |
| BWV | IPATH CBOE S&P 500 BUYWRITE | Stock | BWV | 999 |
| BXUB | Barclays ETN+long B Leveraged ETN Linked to S&P 500 | Stock & Option | BXUB | 999 |

| | | | | |
|---|---|---|---|---|
| BXUC | Barclays ETN+long C Leveraged ETN Linked to S&P 500 | Stock & Option | BXUC | 999 |
| CAFE | IPATH PURE BETA COFFEE | Stock | CAFE | 999 |
| CAPE | BARCLAYS ETN+ SHILLER CAPE | Stock | CAPE | 999 |
| CEFL | ETRACS MONTH PAY 2X LEV C/E | Stock | CEFL | 999 |
| CHOC | IPATH PURE BETA COCOA | Stock | CHOC | 999 |
| CNY | MARKET VECTORS-RENMINBI/USD | Stock | CNY | 999 |
| COW | iPath Dow Jones-UBS Livestock SubIndex Total Return ETN | Stock & Option | COW | 999 |
| CSCB | CREDIT SUISSE CMMDTY BENCHM | Stock | CSCB | 999 |
| CSCR | CREDIT SUISSE CMMDTY ROTAT | Stock | CSCR | 999 |
| CSLS | CS LONG/SHORT LIQUID INDEX | Stock | CSLS | 999 |
| CSMA | CS MERGER ARBITRAGE INDEX | Stock | CSMA | 999 |
| CSMN | CS MARKET NEUTRAL GLO EQTY | Stock | CSMN | 999 |
| CTNN | IPATH PURE BETA COTTON | Stock | CTNN | 999 |
| CUPM | IPATH PURE BETA COPPER | Stock | CUPM | 999 |
| CVOL | C-TRACKS ETN VOLATILITY INDX | Stock | CVOL | 999 |
| DCNG | IPATH SEASONAL NATURAL GAS | Stock | DCNG | 999 |
| DDP | PWRSHS DB COMMODITY SHORT | Stock | DDP | 999 |
| DEE | PowerShares DB Commodity Double Short ETN | Stock & Option | DEE | 999 |
| DEFL | POWERSHARES DB US DEFLATION | Stock | DEFL | 999 |
| DFVL | IPATH US TREASURY 5-YR BULL | Stock | DFVL | 999 |
| DFVS | IPATH US TREASURY 5 YR BEAR | Stock | DFVS | 999 |
| DGAZ | VELOCITYSHARES 3X INVERSE NA | Stock | DGAZ | 999 |
| DGLD | VelocityShares 3x Inverse Gold ETN linked to S&P GSCI Gold Index Excess Return | Stock & Option | DGLD | 999 |
| DIRT | IPATH PURE BETA AGRICULTURE | Stock | DIRT | 999 |
| DJCI | ETRACS DJ-UBS COMMODITY INDX | Stock | DJCI | 999 |
| DJP | iPath Dow Jones-UBS Commodity Index Total Return ETN | Stock & Option | DJP | 999 |
| DPU | POWERSHARES DB COMMODITY LNG | Stock | DPU | 999 |
| DSLV | VelocityShares 3x Inverse Silver ETN linked to S&P GSCI Silver Inverse Index | Stock & Option | DSLV | 999 |
| DTUL | IPATH US TSY 2Y BULL | Stock | DTUL | 999 |
| DTUS | IPATH US TSY 2Y BEAR | Stock | DTUS | 999 |
| DTYL | IPATH US TSY 10Y BULL | Stock | DTYL | 999 |
| DTYS | IPATH US TSY 10Y BEAR | Stock | DTYS | 999 |
| DVHI | ETRACS DIVERSIFIED HIGH INC | Stock | DVHI | 999 |
| DVHL | ETRACS MON PAY 2XLEV HI INC | Stock | DVHL | 999 |
| DVYL | ETRACS 2X DJ SEL DVD ETN | Stock | DVYL | 999 |
| DWTI | VelocityShares 3x Inverse Crude ETN | Stock & Option | DWTI | 999 |
| DYY | PowerShares DB Commodity Double Long ETN | Stock & Option | DYY | 999 |
| EEH | ELEMENTS SPECTRUM ETN | Stock | EEH | 999 |
| EMLB | IPATH LE MSCI EM INDEX ETN | Stock | EMLB | 999 |
| EMSA | IPATH SE MSCI EM INDEX ETN | Stock | EMSA | 999 |
| ERO | IPATH EUR/USD EXCHANGE RATE | Stock | ERO | 999 |
| FBG | FI ENHANCED BIG CAP GR ETN | Stock | FBG | 999 |
| FEEU | FI ENHANCED EUROPE 50 ETN | Stock | FEEU | 999 |
| FIBG | CS FI ENHANCED BIG CAP GROW | Stock | FIBG | 999 |
| FIEG | FI ENHANCED GLOBAL HI YLD | Stock | FIEG | 999 |
| FIEU | CS FI ENHANCED EUROPE 50 ETN | Stock | FIEU | 999 |
| FIGY | FI ENHANCED GLOBAL HIGH YLD | Stock | FIGY | 999 |
| FLAT | IPATH US TSY FLATTENER | Stock | FLAT | 999 |
| FOIL | IPATH PURE BETA ALUMINUM | Stock | FOIL | 999 |
| FUD | ETRACS CMCI FOOD TR ETN | Stock | FUD | 999 |
| | iPath Dow Jones-UBS Natural Gas Subindex Total Return | | | |

| GAZ | ETN | Stock & Option | GAZ | 999 |
|-----|-----|----------------|-----|-----|
| GBB | IPATH GBP/USD EXCHANGE RATE | Stock | GBB | 999 |
| GCE | CLAYMORE CEF GS CONNECT ETN | Stock | GCE | 999 |
| GLDI | Gold Shares Covered Call ETN | Stock & Option | GLDI | 999 |
| GRN | IPATH GLOBAL CARBON ETN | Stock | GRN | 999 |
| GRU | ELEMENTS MLCX Grains Index TR ETN | Stock & Option | GRU | 999 |
| GRWN | IPATH PURE BETA SOFTS | Stock | GRWN | 999 |
| GSC | GS CONNECT S&P GSCI ENH COMM | Stock | GSC | 999 |
| GSP | IPATH GSCI TOTAL RETURN | Stock | GSP | 999 |
| HEVY | IPATH PURE BETA INDUSTRIALS | Stock | HEVY | 999 |
| ICI | IPATH OPTIMIZED CURRENCY ETN | Stock | ICI | 999 |
| IMLP | IPATH S&P MLP ETN | Stock | IMLP | 999 |
| INFL | POWERSHARES DB US INFLATION | Stock | INFL | 999 |
| INP | iPath MSCI India Index ETN | Stock & Option | INP | 999 |
| INR | MARKET VECTORS-RUPEE/USD ETN | Stock | INR | 999 |
| ITLT | POWERSHARES DB 3X ITAL TR BD | Stock | ITLT | 999 |
| ITLY | POWERSHARES DB ITALIAN TR BD | Stock | ITLY | 999 |
| IVOP | IPATH INVERSE S&P 500 VIX II | Stock | IVOP | 999 |
| JEM | IPATH GEMS INDEX ETN | Stock | JEM | 999 |
| JGBD | POWERSHARES DB 3X INVER JPN | Stock | JGBD | 999 |
| JGBL | POWERSHARES DB JAPANESE GOVE | Stock | JGBL | 999 |
| JGBS | POWERSHARES DB INVERSE JAPAN | Stock | JGBS | 999 |
| JGBT | POWERSHARES DB 3X JAPAN GOVT | Stock | JGBT | 999 |
| JJA | IPATH DJ-UBS AGR SUBINDX TOT | Stock | JJA | 999 |
| JJC | iPath Dow Jones-UBS Copper Subindex Total Return ETN | Stock & Option | JJC | 999 |
| JJE | iPath Dow Jones-UBS Energy Subindex Total Return ETN | Stock & Option | JJE | 999 |
| JJG | iPath Dow Jones-UBS Grains Subindex Total Return ETN | Stock & Option | JJG | 999 |
| JJM | IPATH DJ-UBS INDSTR METALS | Stock | JJM | 999 |
| JJN | IPATH DJ-UBS NICKEL SUBINDEX | Stock | JJN | 999 |
| JJP | IPATH DJ-UBS PRECIOUS METALS | Stock | JJP | 999 |
| JJS | IPATH DJ-UBS SOFTS SUBINDEX | Stock | JJS | 999 |
| JJT | IPATH DJ-UBS TIN SUBINDX TOT | Stock | JJT | 999 |
| JJU | IPATH DJ-UBS ALUMINUM SUBIND | Stock | JJU | 999 |
| JO | iPath Dow Jones-UBS Coffee Subindex Total Return ETN | Stock & Option | JO | 999 |
| JYN | IPATH JPY/USD EXCHANGE RATE | Stock | JYN | 999 |
| LBND | POWERSHARES DB 3X LONG 25+ T | Stock | LBND | 999 |
| LD | IPATH DJ-UBS LEAD SUBINDX TO | Stock | LD | 999 |
| LEDD | IPATH PURE BETA LEAD | Stock | LEDD | 999 |
| LSTK | IPATH PURE BETA LIVESTOCK | Stock | LSTK | 999 |
| MFLA | IPATH LE MSCI EAFE INDEX ETN | Stock | MFLA | 999 |
| MLPG | ETRACS ALERIAN NAT GAS MLP | Stock | MLPG | 999 |
| MLPI | ETRACS ALERIAN INFRASTRUCTUR | Stock | MLPI | 999 |
| MLPL | ETRACS 2X LEV LG ALERIAN MLP | Stock | MLPL | 999 |
| MLPN | Credit Suisse MLP Equal Weight Index ETN | Stock & Option | MLPN | 999 |
| MLPS | ETRACS 1XM SH ALERIAN MLP IN | Stock | MLPS | 999 |
| MLPW | ETRACS WELLS FARGO MLP INDEX | Stock | MLPW | 999 |
| MLPY | Morgan Stanley Cushing MLP High Income Index ETN | Stock & Option | MLPY | 999 |
| MORL | ETRACS MONTHLY PAY 2XLEVERAG | Stock | MORL | 999 |
| NIB | iPath Dow Jones-UBS Cocoa Subindex Total Return ETN | Stock | NIB | 999 |
| NINI | IPATH PURE BETA NICKEL | Stock | NINI | 999 |
| OFF | ETRACS FISHER-GARTMAN RISK | Stock | OFF | 999 |
| OLEM | IPATH PURE BETA CRUDE OIL | Stock | OLEM | 999 |

| OLO | POWERSHARES DB CRUDE OIL LNG | Stock | OLO | 999 |
|---|---|---|---|---|
| ONG | IPATH PURE BETA ENERGY | Stock | ONG | 999 |
| ONN | ETRACS FISHER-GARTMAN RISK | Stock | ONN | 999 |
| OSMS | BARCLAYS OFI STEELPATH MLP | Stock | OSMS | 999 |
| PGD | IPATH ASIAN & GULF CURRENCY | Stock | PGD | 999 |
| PGM | IPATH DJ-UBS PLATINUM SUBIND | Stock | PGM | 999 |
| PTM | ETRACS CMCI Long Platinum Total Return ETN | Stock & Option | PTM | 999 |
| RGRA | RBS ROGERS ENHANCED AGRICULT | Stock | RGRA | 999 |
| RGRC | RBS ROGERS ENHANCED COMMODIT | Stock | RGRC | 999 |
| RGRE | RBS ROGERS ENHANCED ENERGY | Stock | RGRE | 999 |
| RGRI | RBS ROGERS ENHANCED INDUSTRI | Stock | RGRI | 999 |
| RGRP | RBS ROGERS ENHANCED PRECIOUS | Stock | RGRP | 999 |
| RJA | ELEMENTS Rogers Intl Commodity Agri | Stock & Option | RJA | 999 |
| RJI | ELEMENTS Rogers Intl Commodity ETN | Stock & Option | RJI | 999 |
| RJN | ELEMENTS Rogers Intl Commodity Engy ETN | Stock & Option | RJN | 999 |
| ROLA | IPATH LX RUSSELL 1000 ETN | Stock | ROLA | 999 |
| RTLA | IPATH LX RUSSELL 2000 ETN | Stock | RTLA | 999 |
| RWXL | ETRACS 2X LEV DJ INTL RE SEC | Stock | RWXL | 999 |
| SBND | POWERSHARES DB 3X SH 25+ TR | Stock | SBND | 999 |
| SBV | IPATH PURE BETA S&P GSCI | Stock | SBV | 999 |
| SDYL | ETRACS 2X S&P DVD ETN | Stock | SDYL | 999 |
| SFLA | iPath Long Extended S&P 500 TR Index ETN | Stock & Option | SFLA | 999 |
| SGAR | IPATH PURE BETA SUGAR | Stock | SGAR | 999 |
| SGG | iPath Dow Jones-UBS Sugar Subindex Total Return ETN | Stock & Option | SGG | 999 |
| SLVO | SILVER SHARES COVERED CALL | Stock | SLVO | 999 |
| SPGH | ETRACS S&P 500 GOLD HEDGED | Stock | SPGH | 999 |
| SPLX | ETRACS MNTHLY RESET 2XS&P500 | Stock | SPLX | 999 |
| STPP | IPATH US TREASURY STEEPENER | Stock | STPP | 999 |
| TCHI | RBS CHINA TRENDPILOT CHINA | Stock | TCHI | 999 |
| TVIX | VelocityShares Daily 2x VIX Short Term ETN | Stock & Option | TVIX | 999 |
| TVIZ | VelocityShares Daily 2x VIX Medium Term ETN | Stock & Option | TVIZ | 999 |
| TWTI | RBS OIL TRENDPILOT ETN | Stock | TWTI | 999 |
| UAG | ETRACS BBG CMCI AGRICULTURE | Stock | UAG | 999 |
| UBC | ETRACS CMCI LIVESTOCK TR ETN | Stock | UBC | 999 |
| UBG | ETRACS CMCI GOLD TR ETN | Stock | UBG | 999 |
| UBM | ETRACS CMCI INDUST MTLS TR | Stock | UBM | 999 |
| UBN | ETRACS CMCI ENERGY TR ETN | Stock | UBN | 999 |
| UCI | ETRACS CMCI TOTAL RETURN ETN | Stock | UCI | 999 |
| UGAZ | VelocityShares 3x Long Natural Gas ETN | Stock | UGAZ | 999 |
| UGLD | VelocityShares 3x Long Gold ETN linked to the S&P GSCI Gold Index | Stock & Option | UGLD | 999 |
| USLV | VelocityShares 3x Long Silver ETN linked to the S&P GSCI Silver Index | Stock & Option | USLV | 999 |
| USV | ETRACS CMCI SILVER TR ETN | Stock | USV | 999 |
| UWTI | VelocityShares 3x Long Crude ETN | Stock & Option | UWTI | 999 |
| VIIX | VelocityShares VIX Short Term ETN | Stock & Option | VIIX | 999 |
| VIIZ | VELOCITYSHARES VIX MED-TERM | Stock | VIIZ | 999 |
| VXX | iPATH S&P 500 VIX Short-Term Futures ETN | Stock & Option | VXX | 999 |
| VXZ | iPath S&P 500 VIX Mid-Term Futures ETN | Stock & Option | VXZ | 999 |
| WEET | IPATH PURE BETA GRAINS | Stock | WEET | 999 |
| XIV | VelocityShares Daily Inverse VIX Short Term ETN | Stock & Option | XIV | 999 |
| XVIX | ETRACS DAILY LONG/SHORT VIX | Stock | XVIX | 999 |
| XVZ | IPATH S&P 500 DYN VIX ETN | Stock | XVZ | 999 |

Securities Ineligible for Portfolio Margining | IB Knowledge Base                                          9/18/15, 4:09 PM

| XXV | iPath Inverse S&P 500 VIX Short-Term Futures ETN | Stock & Option | XXV | 999 |
| ZIV | VelocityShares Daily Inverse VIX Medium Term ETN | Stock & Option | ZIV | 999 |

Margin

## Related Articles

Special risk relating to offsets between options and futures
Overview of IB issued Share CFDs
List of Reverse-Merger Stocks Subject to Increased Margin Requirements
Margin Requirement on Leveraged ETF Products
Mutual Offset System

## Feedback

Please provide feedback on this information

**Was this information useful?:** *

⊙ Yes

○ No

**Was this information sufficient to address your inquiry without further Customer Service contact?:** *

⊙ Yes

○ No

**Tell us what can we do to improve this information:**

Please note that while we read and take into consideration all feedback, we are not able to respond directly to comments or questions submitted through this forum. Should you have an inquiry or require assistance, please contact Customer Service.

Send feedback