

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HEATHER HAUPTMAN and TIMOTHY MOSS,   :
*individually and on behalf of others similarly situated,* :

                     Plaintiffs,   :

                          :

          -against-   :

                          :

INTERACTIVE BROKERS, LLC,   :

                          :

               Defendant.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MEMORANDUM
DECISION AND ORDER

17 Civ. 9382 (GBD)

**GEORGE B. DANIELS, United States District Judge:**

Plaintiffs Heather Hauptman and Timothy Moss are investors who bring this putative class action against their former broker-dealer, Defendant Interactive Brokers, LLC, alleging that Defendant breached its contractual obligations by including certain exchange traded notes ("ETNs") in their portfolio margin investment accounts. (*See* Am. Compl., ECF No. 5.) Defendant moves to dismiss Plaintiffs' Amended Complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure and, in the alternative, for failure to state a claim pursuant to Rule 12(b)(6). (ECF No. 37.)

Defendant's motion to dismiss for failure to state a claim is GRANTED.

## I.   FACTUAL BACKGROUND

Plaintiffs are former customers of Defendant, an electronic-only broker-dealer and trading platform registered with the Financial Industry Regulatory Authority ("FINRA"). (Am. Compl. ¶ 31.) Plaintiffs' accounts with Defendant were used to engage in margin trading, a practice by which investors can leverage their existing portfolio to purchase or sell additional securities beyond the value of the principal they have invested using money loaned by their broker-dealer. (*Id.* ¶¶ 2, 16.) Accounts engaged in such trading have a "margin requirement," a minimum equity

value that must be in the account to serve as collateral. (*Id.* ¶ 17.) If the value of the account falls below the margin requirement, the broker-dealer may issue a "margin call," which requires the investor to put additional capital into the account to bring it up to the margin requirement, liquidate positions and turn over the proceeds to the broker-dealer, or a combination of the two. (*Id.* ¶ 18.)

In traditional "strategy-based" or "Regulation T" margining, the margin requirement is determined by a formula that is a function of the size and market price of each position. (*Id.* ¶ 20.) In portfolio margining, the margin requirement is calculated using a complex statistical model that assesses the potential volatility of each security and measures the impact of various price movements on a portfolio as a whole. (*Id.*)

FINRA Rule 4210, which governs margin trading, contains a list of products eligible for portfolio margin treatment, including "margin equity securit[ies]." (*Id.* ¶ 23.) According to Plaintiffs, ETNs are not eligible for portfolio margin treatment because they are debt instruments, not equity securities, and do not fall within any other category of financial products listed in Rule 4210. (*Id.* ¶¶ 25–26.)

When opening their portfolio margin accounts with Defendant, Plaintiffs were required to sign the Interactive Brokers LLC Customer Agreement (the "Customer Agreement"). (*Id.* ¶ 32; *see also id.*, Ex. 1 ("Customer Agmt.").) The Customer Agreement states, among other things, that "[a]ll transactions are subject to rules and policies of relevant markets and clearinghouses, and applicable laws and regulations." (*Id.* (quoting Customer Agmt. ¶ 6).) Plaintiffs allege that the "applicable laws and regulations" include relevant FINRA rules, such as Rule 4210. (Am. Compl. ¶ 32.) The Customer Agreement also states that "[m]argin transactions are subject to margin requirements of exchanges, clearinghouses and regulators and also to any additional margin requirement of [Defendant], which may be greater." (*Id.* ¶ 33 (quoting Customer Agmt. ¶ 11(B)).)

2

At the time Plaintiffs opened their accounts, Defendant also provided Plaintiffs with a Portfolio Margin Risk Disclosure Statement (the "Portfolio Margin Disclosure") and obtained an acknowledgment from Plaintiffs that they had received and read it. (Am. Compl. ¶¶ 34, 88; *see also id.*, Ex. 2 ("Portfolio Margin Disclosure").) Plaintiffs allege that the Portfolio Margin Disclosure is a "word-for-word copy of FINRA NTM 08-09, the regulatory guidance interpreting FINRA Rule 4210." (Am. Compl. ¶¶ 35, 88; *see also* Portfolio Margin Disclosure.) According to Plaintiffs, the Portfolio Margin Disclosure "constitute[d] an agreement . . . that [Defendant] would not apply portfolio margin [treatment] to products other than those listed in . . . the Portfolio Margin Disclosure," and "ETNs are not included" in the products listed. (Am. Compl. ¶¶ 88–89.)

From in or around April 2014 until January 2016, Defendant published a notice on its website stating that ETNs are not eligible for portfolio margin treatment and that Defendant would not provide portfolio margin for ETNs. (*Id.* ¶ 36; *see also id.* Ex. 3.) Plaintiffs allege that, notwithstanding the statement on Defendant's website, from 2011 through the present, Defendant calculated margin requirements for ETNs using the portfolio margin requirements, rather than traditional margin requirements. (Am. Compl. ¶ 37.) Plaintiffs allege that calculating margin requirements for ETNs using portfolio margin treatment breached Defendant's obligations under the Customer Agreement, the Portfolio Margin Disclosure, and the FINRA regulations that Defendant is contractually obligated to follow. (*Id.* ¶ 37.)

The named Plaintiffs' portfolio margin accounts held ETNs from the Barclays Bank PLC iPath S&P 500 VIX Short-Term Futures ETN, which trades under the stock symbol VXX (the "VXX"). (*Id.* ¶¶ 27, 44, 47–48.) Over the weekend after August 21, 2015, stock futures in the United States began to drop due to events unfolding in the Asian markets. (*Id.* ¶ 49.) At midnight on August 24, 2015, Defendant increased the margin requirements for the VXX and VXX option

positions for all of its clients, including Plaintiffs.  (*Id.*)  When the markets opened later that day, the price of the VXX spiked and, as a result, the value of Plaintiffs' portfolio margin accounts dropped.  (*Id.*)  In response to the increase in the margin requirements and the decrease in Plaintiffs' account value, Defendant forced the liquidation of most of the positions in Plaintiffs' accounts, resulting in large losses to Plaintiffs.  (*Id.* ¶ 50.)  The named Plaintiffs in this action allege that similar losses were sustained by other clients of Defendant, and seek certification of a class of "[a]ll persons who held a Portfolio Margin Account with Defendant containing a position or option in an ETN at any point from December 1, 2011 through the date of judgment, and whose ETN positions received Portfolio Margin treatment."  (*Id.* ¶ 56.)  Plaintiffs allege that the class consists of more than a thousand members.  (*Id.* ¶ 57.)

On behalf of themselves and the putative class members, Plaintiffs assert state law claims for breach of contract, promissory estoppel, breach of the implied covenant of good faith and fair dealing, unjust enrichment, negligence, and declaratory and injunctive relief.  (*See id.* ¶¶ 77–130.) Defendant moves to dismiss Plaintiffs' action on the grounds that Plaintiffs' state law claims are preempted by federal law and precluded by the Securities Litigation Uniform Standards Act ("SLUSA"), 15 U.S.C. § 77a *et seq.*  Defendant also contends that each of Plaintiffs' claims fails on its merits because Plaintiffs have failed to plead the requisite elements.

## II.    IMPLIED PREEMPTION DOES NOT APPLY

Defendant argues Plaintiffs' claims are impliedly preempted by federal law.  (Def. Amended Mem. in Supp. of Mot. to Dismiss, ECF No. 42, at 13–15.)  There are two types of implied preemption: "field preemption," which exists "where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law," and "conflict preemption," which exists "where local law conflicts with federal law

such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives." *Figueroa v. Foster,* 864 F.3d 222, 227 (2d Cir. 2017). Neither form of implied preemption applies here.

## A. Field Preemption

"It is well-settled that federal law does not enjoy complete preemptive force in the field of securities," because federal securities laws were "intended to permit state securities regulators to continue to exercise their police power to prevent fraud and broker-dealer sales practice abuses." *Zuri-Invest AG v. Natwest Fin. Inc.*, 177 F. Supp. 2d 189, 195 (S.D.N.Y. 2001); *see also Houston v. Seward & Kissel, LLP*, No. 07 Civ. 6305 (HB), 2008 WL 818745, at *5 n.10 (S.D.N.Y. Mar. 27, 2008) ("State securities regulators . . . exercise their police power to prevent fraud and . . . sales practice abuses.") (citation omitted).

Where, as here, "Congress legislates in an area that is within the states' traditional police powers, intent to preempt the field will ordinarily not be inferred unless such intent is 'clear and manifest.'" *N.Y. Pet Welfare Ass'n, Inc. v. City of N.Y.*, 850 F.3d 79, 89 (2d Cir. 2017) (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990)). Such an intent cannot be inferred from "the mere existence of a federal regulatory or enforcement scheme, even one [that is] detailed." *English*, 496 U.S. at 87. "As a result of their specialized functions, agencies normally deal with problems in far more detail than does Congress." *Hillsborough Cty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 717 (1985). "[T]o infer pre-emption [sic] whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field, its regulations will be exclusive," which "would be inconsistent with the federal-state balance embodied in . . . Supremacy Clause jurisprudence." *Id.*

Moreover, "concluding Congress intended to occupy [a] field . . . does not end [the court's] task," because the court "must determine . . . the scope of that preemption." *Goodspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 634 F.3d 206, 210–11 (2d Cir. 2011). A plaintiff's claims will only be preempted if they "interfere with federal laws and regulations sufficiently to fall within the scope of the preempted field." *Id.* at 211. "[T]he federal government's intent to pre-empt substantive state-law *standards* does not necessarily imply an intent to preempt state-law *remedies* for violations of federal standards." *Drake v. Lab. Corp. of Am. Holdings*, 458 F.3d 48, 64 (2d Cir. 2006). In other words, the fact that federal law "stops [s]tates from imposing their own substantive standards" in a field does not stop the states "from affording relief to a party who claims and proves that an [entity] dishonored a [contractual] term the [entity] itself stipulated [to]." *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 232–33 (1995).

Defendant argues that field preemption should be found here, because "margin practices" are "an area the Second Circuit [has] found to be fully occupied by federal law." (Mem. at 14.) However, "the mere existence of a federal regulatory or enforcement scheme" does not warrant a finding of preemption. *English*, 496 U.S. at 87. Defendant's discussion of Securities and Exchange Commission ("SEC") and FINRA regulations concerning margin rules does not, in itself, provide a basis to conclude Plaintiffs' claims are preempted. (Mem. at 4–7.)

*Levitin v. PaineWebber, Inc.*, 159 F.3d 698 (2d Cir. 1998), upon which Defendant relies, does not support a finding of preemption here. (Mem. at 14.) In that case, the plaintiff asserted state and federal fraud claims alleging she was deceived by the defendant's failure to disclose it was misappropriating the collateral that plaintiff deposited in her margin account and the interest earned on that collateral. *Levitin*, 159 F.3d at 702. Plaintiff's claim to an ownership interest in the collateral was based on § 9-207(2)(c) of the New York Uniform Commercial Code ("UCC"),

which "provides that, absent a contrary agreement, profits realized from collateral while in the secured party's possession belong to the debtor." *Id.* at 704. The Second Circuit noted that the plaintiff's "argument, if accepted, would allow a state to require that collateral be treated as the customer's [segregated] property and that some form of interest be paid on that property." *Id.* at 706. The Second Circuit then found that, assuming the plaintiff's interpretation of the UCC was correct, it would be preempted because, among other things, "Congress, the SEC, and the Federal Reserve Board have imposed . . . detailed regulations on short sales and on the use of margin . . . that explicitly permit[] brokers to commingle customer funds and implicitly permit[] them to retain earnings on collateral posted for short sales." *Id.* at 707. The Second Circuit further found that, in light of those regulations, "'Congress [has] left no room for the States to supplement' federal law" in that area. *Id.* at 707 (citation omitted).

The federal laws that "permit[] brokers to commingle customer funds" and "retain earnings on collateral posted for short sales" are not implicated here. *Id.* As such, Plaintiffs' claims do not fall within the "scope of the preempted field" at issue in *Levitin. Goodspeed*, 634 F.3d at 211. Moreover, in *Levitin*, the plaintiff was asking the court to adopt a state law *standard* (*i.e.*, a theory of ownership predicated on UCC § 9-207(2)(c)), to adjudicate her claims. *See* 159 F.3d at 704. Here, by contrast, Plaintiffs argue that Defendant's violation of a federal standard entitles them to state law *remedies*. Thus, even if federal law preempts states from adopting their own standards regarding margin transactions, such preemption would not prevent states from "affording relief to [Plaintiffs]" based on Defendant's violation of a contractual obligation to abide by the federal standards or commission of a tort that would constitute a violation of the federal standards. *Wolens*, 513 U.S. at 232. Thus, Plaintiffs' claims are not subject to field preemption.

## B. Conflict Preemption

"[C]onflict preemption refers to situations . . . where the state law at issue 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"[1] *Marentette v. Abbott Labs., Inc.*, 886 F.3d 112, 117 (2d Cir. 2018) (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)). "What constitutes a 'sufficient obstacle' is 'a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects.'" *In re MTBE Prods. Liability Litig.*, 725 F.3d 65, 101 (2d Cir. 2013) (quoting *Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 162 (2d Cir. 2013)). "The burden of establishing obstacle preemption . . . is heavy," and is not met "unless 'the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together.'" *Id.* (quoting *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 241 (2d Cir. 2013)).

In arguing that conflict preemption exists here, Defendant relies on *Lanier v. Bats Exchange, Inc.*, 838 F.3d 139 (2d Cir. 2016). In that case, the plaintiff alleged, among other things, that the defendant securities exchanges "ha[d] not fulfilled obligations imposed on them by SEC regulations." *Id.* at 151. The Second Circuit noted that, "in order to find that [the plaintiff's] claims are preempted," it had to "find . . . that plaintiff's interpretation of what the SEC regulations require, and upon which his claims are predicated, conflict[ed] with the SEC's own interpretation of the same regulations." *Id.* at 151–52. In finding such a conflict, the Second Circuit explained that the plaintiff's interpretation of the relevant regulation was contrary to the SEC's interpretation in the SEC release adopting the regulation, which the SEC had "affirmed by later SEC releases and enforcement actions." *Id.* at 153.

---

[1] The second type of conflict preemption, which occurs when it is "impossible for a party to comply with both" state and federal law, is not implicated here. *Figueroa*, 864 F.3d at 227.

Here, though Defendant asserts that "the SEC has repeatedly and publicly declared that ETNs . . . would . . . be treated as equity securities for purposes of trading and margin rules," the releases that Defendant cites predate the adoption of FINRA Rule 4210 and do not specifically relate to that rule.[2]  (Mem. at 6.)  Absent clear and directly relevant guidance from the SEC, there is no conflict between Plaintiffs' interpretation of Rule 4210 and the SEC's that is "so direct and positive that the two . . . cannot be reconciled or consistently stand together." *In re MTBE*, 725 F.3d at 101.  Plaintiffs' claims are therefore not impliedly preempted.

### III.   PLAINTIFFS' CLAIMS ARE NOT PRECLUDED UNDER SLUSA

Defendant argues that all of Plaintiffs' claims are precluded under SLUSA.  (Mem. at 7–11.)  A claim is precluded under SLUSA if it is: "(1) [brought in] 'a covered class action'; (2) based on state statutory or common law; (3) concerning a covered security; and (4) alleging that defendants made a misrepresentation or omission of a material fact . . . in connection with the purchase or sale of that security."[3]  *O'Donnell v. AXA Equitable Life Ins. Co.*, 887 F.3d 124, 127 (2d Cir. 2018) (citing 15 U.S.C. § 78bb(f)).  The term "covered class action" is defined to include "any single lawsuit in which . . . damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members . . . predominate over any questions affecting only individual persons or members."

---

[2] Plaintiffs contend that the releases cited by Defendant are not relevant because they were "supplanted by FINRA Rule 4210 and FINRA interpretations in 2010."  (Pls. Mem. in Opp'n to Def. Mot. to Dismiss ("Opp'n"), ECF No. 47, at 16.)  Defendant asserts that releases remain relevant because "the transition from NYSE Rule 431 to FINRA Rule 4210 did nothing to change the scope of portfolio marginable securities." (Def. Reply in Supp. of Mot. to Dismiss ("Reply"), ECF No. 51, at 5.)  Because the parties dispute the relevance of the releases, this Court declines to take judicial notice of the releases in deciding the instant motion. *See Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

[3] SLUSA provides, in relevant part, "[n]o covered class action based upon the statutory or common law of any State . . . may be maintained in any State or Federal court by any private party alleging . . . a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1).

15 U.S.C. § 78bb(f)(5)(B)(i).  "[A] covered security is one that is 'listed, or authorized for listing, on [the national exchanges]' or that is 'issued by an investment company that is registered, or that has filed a registration statement, under the Investment Company Act of 1940.'"  *Romano v. Kazacos*, 609 F.3d 512, 520 n.3 (2d Cir. 2010) (quoting 15 U.S.C. § 77r(b)).

Plaintiffs' claims clearly satisfy three of the four elements of SLUSA preclusion.  First, the claims are brought in a "covered class action," because Plaintiffs allege that "the class members number . . . more than 1,000" and that there are "common questions of law and fact" that "predominate over questions that may affect individual class members."  (Am. Compl. ¶¶ 57, 63–65.)  Second, Plaintiffs' claims are all based on state law.  (*See id.* ¶¶ 77–130.)  Third, this action concerns "covered securities," because Plaintiffs allege that the ETNs at issue are "traded on the major stock exchanges."  (*Id.* ¶ 26.)

Determining whether a claim "allege[s] that defendants made a misrepresentation or omission of a material fact" for purposes of the fourth element of SLUSA preclusion requires consideration of "the substance of a complaint's allegations," not simply "a formalistic search through the pages of the complaint for magic words."  *Romano*, 609 F.3d at 520 (quoting *Segal v. Fifth Third Bank, N.A.*, 581 F.3d 305, 310 (6th Cir. 2009)).  "A state law claim is precluded . . . only if the alleged misrepresentation is 'necessary to . . . liability under the state law claim[].'"  *R.W. Grand Lodge of Free & Accepted Masons of Penn. v. Meridian Capital Partners*, 634 F. App'x 4, 8 (2d Cir. 2015) (quoting *In re Kingate Mgmt. Ltd. Litig.*, 784 F.3d 128, 142 (2d Cir. 2015)) (omission and alteration in original).  "[S]tate law claims that do not *depend* on false conduct are not within the scope of SLUSA, even if the complaint includes peripheral, inessential mentions of false conduct."  *Kingate*, 784 F.3d at 142.

Defendant argues that "the realities underlying the claims bring the entire [Amended] Complaint within the scope of SLUSA, for at its core the [Amended] Complaint alleges that [Defendant] promised and represented one thing regarding its margin practices and did precisely the opposite." (Mem. at 8.) As a threshold matter, Defendant cannot establish that Plaintiffs' claims are precluded by SLUSA by referring to "the entire Complaint," (*id.*), because "SLUSA preempts claims[,] not entire actions." *In re Facebook, Inc., Initial Pub. Offering Derivative Litig.*, 797 F.3d 148, 158 (2d Cir. 2015). To "rule on the impact of SLUSA, a court must "undertake a claim-by-claim analysis." *Id.*

Because Plaintiffs' breach of contract claims neither have fraud as an element nor sound in fraud, they are not precluded by SLUSA. "'[B]reaches of contract generally fall outside the scope of the securities laws,' because failing 'to carry out a promise made in connection with a securities transaction . . . does not [constitute fraud] unless, when the promise was made, the defendant secretly intended not to perform or knew that he could not perform.'" *In re Stillwater Capital Partners Inc. Litig.*, 851 F. Supp. 2d 556, 573 (S.D.N.Y. 2012) (quoting *Capital Mgmt. Select Fund Ltd. v. Bennett*, 670 F.3d 194, 204 (2d Cir. 2012)) (alteration and omission in original). Where the plaintiff has not "made any allegations about [a defendant's] mental state at the time that the parties entered into . . . contract," the plaintiff's "claims do not sound in fraud" and are not precluded by SLUSA. *Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.*, 341 F. Supp. 2d 258, 269 (S.D.N.Y. 2004); *see also Normand v. Bank of N.Y. Mellon*, No. 16 Civ. 212 (JPO), 2016 WL 5477783, at *6 (S.D.N.Y. Sept. 29, 2016) ("Plaintiffs' breach of contract claim does not depend on any misrepresentation or omission. . . . Any allegation of misrepresentation is 'extraneous to the complaint's theory of liability,' and thus 'cannot be the basis for SLUSA preclusion.'") (quoting *Kingate*, 784 F.3d at142–43).

11

Here, neither of Plaintiffs' breach of contract claims is properly characterized as a fraud claim, because whether Defendant violated a provision of the Customer Agreement and/or Portfolio Margin Disclosure by including ETNs in its portfolio margin calculations does not "*depend* on [allegations of] false conduct." *Kingate*, 784 F.3d at 142. Although Defendant asserts that the Amended Complaint is "replete with allegations of misrepresentations and omissions," (Mem. at 8), such allegations are "extraneous to the [Amended Complaint's] theory of liability" and cannot provide a basis for SLUSA preclusion. *Normand*, 2016 WL 5477783, at *6.

According to Defendant, Plaintiffs allege that Defendant never intended to honor its promise not to use ETNs in portfolio margin calculations. (Reply at 2; *see also* Mem. at 8.) However, Plaintiffs' Amended Complaint does not actually contain "any allegations about [Defendant's] mental state at the time that the parties entered into" the Customer Agreements or Portfolio Margin Disclosure.[4] *Xpedior*, 341 F. Supp. 2d at 269. Thus, Plaintiffs' breach of contract claims do not sound in fraud and are not precluded under SLUSA.

Plaintiffs' remaining substantive claims—promissory estoppel, unjust enrichment, breach of the implied covenant of good faith and fair dealing, and negligence—are also not precluded by SLUSA because they do not "rely on false conduct." *Fishman v. Phila. Fin. Life Assurance Co.*, No. 11 Civ. 1283 (TPG), 2016 WL 2347921, at *13 (S.D.N.Y. May 3, 2016) (claims for promissory estoppel, breach of the implied covenant of good faith and fair dealing, and unjust

---

[4] Defendant notes that the Amended Complaint alleges that Defendant "*knowingly* breached its contractual obligations" and "act[ed] in a manner directly contrary to . . . its own disclosures" and 'public and private pronouncements.'" (Reply at 2 (quoting Am. Compl. ¶¶ 5, 37, 102).) But "at its core, fraud requires proof of deception, which is absent from ordinary breach of contract." *U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 660 (2d Cir. 2016) (citations omitted). Here, Plaintiffs do not allege any facts indicating that "at the time the contractual promise[s] [and disclosures were] made, [Defendant] had no intent ever to perform" according to the contracts and disclosures, as would be necessary to state a fraud claim. *Id.*

12

enrichment not precluded); *see also Anwar v. Fairfield Greenwich, Ltd.*, 118 F. Supp. 3d 591, 617

(S.D.N.Y. 2015) (negligence claim not precluded where allegations of "fraud are not essential for

plaintiffs to plead . . . [defendants] breached their duty of care"); *Xpedior*, 341 F. Supp. 2d at 269

(claims for breach of the implied covenant of good faith and fair dealing and unjust enrichment

not precluded because they do not "require misrepresentations or omissions as a necessary

element" and plaintiff did not "allege[] fraud as an integral part of the conduct giving rise to the

claim").

 Here, Plaintiffs' promissory estoppel claim alleges that Defendant violated promises made

in the Customer Agreement, Portfolio Margin Disclosure, and on its website that it would not

include ETNs in its portfolio margin calculations.  (Am. Compl. ¶¶ 94–96, 100–103.)  Plaintiffs'

claims for negligence and breach of the implied covenant of good faith and fair dealing allege that

the use of ETNs in portfolio margin calculations was also a breach of Defendant's duty of

reasonable care and of the implied covenant, respectively.  (*Id.* ¶¶ 115, 119, 122.) Plaintiffs' unjust

enrichment claim alleges that the use of ETNs in margin calculations enabled Defendant to enrich

itself by engaging in trading it could not otherwise have conducted.  (*Id.* at 105–10.)  Such

allegations do not "rely on [allegations of] false conduct," *Fishman*, 2016 WL 2347921, at *13,

and fraud is not an "integral," *Xpedior*, 341 F. Supp. 2d at 269, or "essential" part of the allegations.

*Anwar*, 118 F. Supp. 3d at 617.  Showing that Defendants used ETNs in their portfolio margin

calculations does not depend upon a showing that Defendants made any misrepresentations or

omissions about how those calculations were performed.  Similarly, showing that Defendants

enriched themselves by conducting trades using accounts with portfolio margins calculated using

ETNs does not require proof that Defendants engaged in any deceptive conduct.  Thus, like

Plaintiffs' breach of contract claims, Plaintiffs' remaining substantive claims are not precluded under SLUSA.

## IV.    PLAINTIFFS' CLAIMS FAIL ON THEIR MERITS

After a court determines that a plaintiff's "claims survive SLUSA," it must then "determine whether they must [be] dismissed based on state law principles for failure to state a claim." *Fishman*, 2016 WL 2347921, at *8. Here, Plaintiffs' claims fail on their merits. Plaintiffs' breach of contract claims fail because the language identified by Plaintiffs does not impose any contractual obligations on Defendant. Plaintiffs' remaining substantive claims are duplicative of their breach of contract claims and, absent any viable underlying claims, Plaintiffs are not entitled to declaratory or injunctive relief.

### A.  Plaintiffs' Breach of Contract Claims Fail

In *Gurfein v. Ameritrade, Inc.*, a provision in the plaintiff's customer agreement stated "[a]ll transactions under this Agreement are made subject to the constitution, rules, regulations, customs and usages of the various execution points and their clearinghouse, if any." 312 F. App'x 410, 413 (2d Cir. 2009). The Second Circuit found that provision "served only to "inform[] the customer that her trades are constrained by the rules of governing regulatory agencies," not to "impose[] [contractual] obligations" on the broker-dealer. *Id.* at 414. Though the plaintiff argued that the relevant rules and regulations "were impliedly integrated into the contract," the Second Circuit noted that those rules and regulations did not "provide investors with a private right of action" and found the plaintiff was "precluded from creating a private cause of action for violations of th[e] rules and regulations by fashioning her claim as one for breach of contract." *Id.* at 414.

As a further basis for her breach of contract claim, the plaintiff cited a provision in the customer agreement stating, "I am aware of and agree . . . all my option transactions are subject to

the rules and regulations of" various regulatory bodies. *Id.* at 413. The Second Circuit found that such language "memorializes only [a customer's] acknowledgment that her trades are subject to applicable rules and regulations" and "does not incorporate into the contract the rules and regulations of those outside regulatory bodies. Nor does it impose any contractual obligations on" the broker-dealer. *Id.*

The contractual provisions at issue here are substantially identical to those at issue in *Gurfein.* Plaintiff's claim for breach of the Customer Agreement is premised upon provisions stating that "[a]ll transactions are subject to rules and policies of relevant markets and clearinghouses, and applicable laws and regulations" and that "[m]argin transactions are subject to margin requirements of exchanges, clearinghouses and regulators and also to any additional margin requirement of [Defendant], which may be greater." (Am. Compl. ¶ 33 (quoting Customer Agmt. ¶ 11(B).) But here, as in *Gurfein*, such language only serves to "inform [Plaintiffs] that [their] trades are constrained by the rules of governing regulatory agencies" and does not impose any obligations on Defendant.[5]  312 F. App'x at 413–14. Plaintiff alleges the language in the Customer Agreement "incorporates and includes FINRA Rule 4210." (Am. Compl. ¶ 81.) But the Customer Agreement does not expressly refer to Rule 4210. Moreover, "no private right of action exist[s] . . . for violations of . . . FINRA rules." *Lobaito v. FINRA*, No. 16 Civ. 6011 (GBD), 2014 WL 4470423, at *7 n.3 (S.D.N.Y. Sept. 9, 2014). Plaintiffs cannot create such a private right of action by styling their claim as a breach of contract. *Gurfein*, 312 F. App'x at 414.

---

[5] Plaintiffs note that, in addition to regulatory bodies, the Customer Agreement refers to "any additional margin requirements of [Defendant], which may be greater." (Opp'n at 21.) But Plaintiffs have not identified any margin requirements of Defendant that exceed those imposed by FINRA. Nor are Plaintiffs' claims based on Defendant's breach of such a requirement. Rather, Plaintiffs claim that Defendant breached the Customer Agreement by "failing to abide by 'applicable laws and regulations' and 'margin requirements of . . . regulators.'" (Am. Compl. ¶ 83.)

Plaintiffs' second claim for breach of contract is based on Plaintiffs "acknowledge[ment of] the . . . Portfolio Margin Disclosure." (Am. Compl. ¶ 88.) While the Portfolio Margin Disclosure mentions Rule 4210, such an "acknowledgment that [Plaintiffs'] trades are subject to applicable rules and regulations" does not "incorporate . . . the rules" by reference and does not "impose any contractual obligations on" Defendant. *Gurfein*, 312 F. App'x at 413. Because neither the provisions of the Customer Agreement identified by Plaintiffs nor the Portfolio Margin Disclosure imposed contractual obligations on Defendant, Plaintiffs' breach of contract claims fail.

## B. Plaintiffs' Remaining Substantive Claims Are Duplicative

Where, as here, the parties do not dispute the existence of a valid contract, and "'the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract,' the claim for breach of the implied covenant will be dismissed," even if the contract claim is also "insufficient" to survive a motion to dismiss. *Blessing v. Sirius XM Radio Inc.*, 756 F. Supp. 2d 445, 460 (S.D.N.Y. 2010) (quoting *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002)). Similarly, unjust enrichment and promissory estoppel are "quasi-contract claims," which "must be dismissed as duplicative of a breach of contract claim" when there is a "valid and enforceable written contract governing . . . the same subject matter." *Nahabedian v. Intercloud Sys., Inc.*, No. 15 Civ. 669 (RA), 2016 WL 155084, at *4 (S.D.N.Y. Jan. 12, 2016) (quoting *Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.*, 87 F.3d 604, 610 (2d Cir. 1996)) (internal quotation marks omitted). A negligence claim based on a breach of "duties [that] arise out of the contractual relationship" resulting in harms that "are the same as those alleged under [the plaintiff's] breach of contract" is also impermissibly duplicative. *Wiseman v. ING Groep, N.V.*, No. 16 Civ. 7587 (AJN), 2017 WL 4712417, at *9 (S.D.N.Y. Sept. 28, 2017); *see also Aretakis v. Caesars Ent.*, No. 16 Civ. 8751 (KPF), 2018 WL

1069450, at *12 (S.D.N.Y. Feb. 23, 2018) (dismissing negligence claim as duplicative where the alleged "duty . . . would be inextricably tied to the terms of the alleged contract" and alleged damages for negligence were identical to those sought in contract claim).

Here, the parties do not dispute that the Customer Agreement is a valid contract. (*See* Am. Compl. ¶ 78; Mem. at 22 (characterizing the Customer Agreement as "an undisputed contract").) As explained above, Plaintiffs' remaining substantive claims are all premised on the same conduct—*i.e.*, Defendant's use of ETNs in portfolio margin calculations—that forms the basis of Plaintiffs' breach of contract claim. (*Compare* Am. Compl. ¶¶ 83, 90 (alleging Defendant breached its contractual obligations by "including ETNs in its calculation of portfolio margin"), *with id.* ¶¶ 100, 115, 121 (alleging Defendant breached its promises, the implied covenant of good faith and fair dealing, and a duty of reasonable care by including "ETNs in its calculation of portfolio margin"); *id.* ¶¶ 105–10 (alleging Defendant unjust enriched itself by "improperly calculating portfolio margin requirements to include ETN positions," thereby enabling it to make "margin-financed trades that would not have occurred" otherwise and collecting fees and interest on the trades). The losses alleged in support of Plaintiffs' claims for promissory estoppel, breach of the implied covenant of good faith and fair dealing, and negligence—"investment losses that would not have occurred" if ETNs had not been used in the calculations, (*id.* ¶¶ 103, 116, 122)— are also identical to those alleged in Plaintiffs' breach of contract claim. (*Id.* ¶¶ 85, 90.) Thus, Plaintiffs' claims for breach of the implied covenant of good faith and fair dealing, promissory estoppel, unjust enrichment, and negligence fail because they are duplicative of Plaintiffs' breach of contract claims.

## C.  Plaintiffs Are Not Entitled to Declaratory and Injunctive Relief

Plaintiffs' Amended Complaint includes a request for declaratory and injunctive relief as a separate cause of action.  (*See id.* ¶¶ 124–30.)  But "[d]eclaratory judgments and injunctions are remedies, not causes of action." *Chiste v. Hotels.com LP*, 756 F. Supp. 2d 386, 406 (S.D.N.Y. 2010) (citations omitted).  A plaintiff "cannot maintain an action for a declaratory judgment without an underlying federal cause of action," and "[a] prayer for relief, standing alone, simply does not satisfy the requirement that a case or controversy exists" for a court to adjudicate. *Springfield Hosp. v. Hofmann*, 488 F. App'x 534, 535 (2d Cir. 2012) (internal citations omitted). Because all of Plaintiffs' underlying claims fail, their request for declaratory and injunctive relief is also dismissed.

### V.    CONCLUSION

Defendant's motion to dismiss, (ECF No. 37), is GRANTED.[6]


Dated: New York, New York
          June 12, 2018

                                  SO ORDERED.

                                  *George B. Daniels*
                                  GEORGE B. DANIELS
                                  United States District Judge

---

[6] In their opposition to Defendant's motion, Plaintiffs request leave to amend their Complaint if the motion is granted.  (*See* Opp'n at 25.)  Plaintiffs may seek leave to file an amended pleading by letter application with a proposed amended complaint within thirty days, if such amendment would not be futile.